**In re LEASE OIL ANTITRUST LITIGATION (No. II).**

**MDL No. 1206.**

United States District Court, S.D. Texas, Corpus Christi Division.

May 10, 1999.

---

J.A. "Tony" Canales, Canales & Simonson, Corpus Christi, Liaison Counsel for Plaintiff.

Darrell Lee Barger, Barger, Hermansen et al., Corpus Christi, Liaison Counsel for Defendant.

## ORDER NO. 75 FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PROPOSED SETTLEMENT AGREEMENTS

JACK, District Judge.

On April 5 through 9, 1999, came on to be held a fairness hearing to consider granting approval to eight proposed settlement agreements in the above-styled litigation. For the reasons stated herein, the Court FINDS that all eight of the proposed settlement agreements should be approved.[1]

### I. JURISDICTION

The Court has jurisdiction over the cases in this multidistrict litigation pursuant to the Judicial Panel on Multidistrict Litigation's transfer order of January 14, 1998, and pursuant to 28 U.S.C. §§ 1331, 1332, 1367 and 1407.

### II. FACTS AND PROCEEDINGS[2]

#### A. Procedural Stance and Alignment of Parties

In 1993, Atlantic Richfield, a large producer of crude oil, determined that for several years it had been systematically underpaying many of its royalty owners. Thus, in March 1993, Atlantic Richfield voluntarily sent $19.8 million in reimbursement checks to its royalty owners, explaining that it had underpaid them since 1986.

---

1. The discussion of the facts and law herein are relevant and applicable to all eight of the proposed settlements. However, the Court enters its orders regarding the approval of each of the settlements in eight separate final judgments in order that an appeal of one settlement will not delay the distribution of the funds from all of the other settlements.

2. The findings made herein are for the purpose of Federal Rule of Civil Procedure 23—i.e., that the settlement classes are properly certifiable and that the settlements are fair, adequate, and reasonable—and do not constitute admissions by any defendant.

In July 1995, Mr. Lee Godfrey ("Godfrey") filed a suit in Texas state court, *The State of Texas et al. v. Amoco Production Company, et al.* (the "Texas Suit"), pursuing claims for a putative class of Texas royalty payees against eight major oil companies, alleging basically that oil companies had breached an implied duty under their leases to pay royalty owners the fair market value of their oil at the well. The following year, in April 1996, Mr. Charles Kipple ("Kipple") filed a class action suit against 39 oil companies in federal court on behalf of a putative nationwide class of royalty and working interest owners, *The McMahon Foundation et al. v. Amerada Hess Corp., et al.*, alleging that those companies, in violation of § 1 of the Sherman Act, conspired for over a decade to artificially depress payments made for lease oil to the putative class members. In November 1997, Godfrey and Kipple presented a settlement agreement with 24 defendants to the *McMahon* court. Before any ruling on that settlement, the Judicial Panel on Multidistrict Litigation ("JPML") transferred *McMahon* and several later-filed federal actions to this Court pursuant to 28 U.S.C. § 1407 for coordinated and consolidated proceedings as *In re Lease Oil Antitrust Litigation*, MDL–1206.[3]

On May 14 and 15, 1998, this Court held the initial pretrial conference in MDL–1206. Godfrey, Kipple, plaintiffs' counsel in other related state and federal suits, and 24 (of the 32 named in the MDL consolidated complaint) defendant oil companies expressed

their desire to pursue the "Global Settlement" that Godfrey and Kipple had presented in the *McMahon* court prior to consolidation by the JPML. Accordingly, the Court facilitated the division of the parties present into four groups: Settling Plaintiffs (including Godfrey, Kipple, and counsel for related settling cases), Settling Defendants, Nonsettling Plaintiffs and Nonsettling Defendants. The Court scheduled a preliminary fairness hearing on the proposed Global Settlement[4] for October 1998, and also scheduled a subsequent hearing on class certification for the purposes of litigating claims.

As scheduled, the Court held a four-day preliminary approval hearing in October 1998. At this hearing, the Settling Plaintiffs and Settling Defendants presented testimony from expert witnesses in support of their respective positions and in support of the Global Settlement. The Nonsettling Plaintiffs vigorously cross-examined those experts and presented expert testimony of their own, arguing essentially that the Global Settlement did not adequately compensate class members for their antitrust claims.[5] The Court granted preliminary approval to the Global Settlement and authorized the sending of notice to the settlement class.

Prior to the deadline for sending notice to the class, counsel for both the Settling Plaintiffs and Nonsettling Plaintiffs reached seven distinct settlement agreements with seven remaining Nonsettling Defendants (the "Stand Alone Settlements.") Since these seven defendants represented all of the re-

---

**3.** Presently, MDL–1206 includes fifteen federal suits: *Randolph Energy v. Amerada Hess et al.*, C–98–41; *McMahon Foundation v. Amerada Hess et al.*, C–98–48; *Stanley v. Gulf Oil et al.*, C–98–68; *Nicholson v. Marathon Oil*, C–98–110; *Cameron Parish v. Texaco et al.*, C–98–111, *McMahon Foundation v. Occidental Petroleum et al.*, C–98–130; *Bertolet v. Citgo*, C–98–198; *Mobile County Board of School Commissioners v. Texaco, Inc.*, C–98–328; *Mobile County Board of School Commissioners v. Union Oil*, C–98–436; *Amoco Production v. Cameron Parish School Board*, C–98–437; *Texaco v. Canik et al.*, C–98–438; *Amerada Hess v. Sturlese*, C–98–439; *Phillips v. Cameron Parish School Board*, C–98–443; *Shell Western v. Conner*, C–98–444; *Lovelace v. Amerada Hess et al.*, C–99–75. One related case was also filed in this Court: *Brown v. Amoco, et al.*, C–98–217.

**4.** The Global Settlement releases claims against the Settling Defendants listed in Revised Exhibit

H–6 to the agreement, for the period of January 1, 1986 through September 30, 1998. The principal Settling Defendants are as follows: Amerada Hess Corp., Amoco Production Co., BP Exploration & Oil Inc., Burlington Resources Oil & Gas Co., Chevron USA Inc., CITGO Petroleum Corp., The Coastal Corp., Conoco Inc., Diamond Shamrock Refining Co., L.P., EOTT Energy Operating Limited Partnership, Hunt Oil Co., Kerr–McGee Corp., The Louisiana Land & Exploration Co., Marathon Oil Co., Oryx Energy Co., Oxy USA, Inc., Pennzoil Co., Phillips Petroleum Co., Scurlock Permian Corp., Shell Oil Co., Sun Company, Inc. (R & M), Texaco Inc., and Union Pacific Resources Co. It releases the claims as to Unocal Corporation for the period of January 1, 1986 through September 30, 1997, only.

**5.** These claims are described in more detail below.

maining significant defendants in the oil industry, the approval of these Stand–Alone Settlements along with the Global Settlement would effectively mean the conclusion of the multidistrict litigation. In December 1998, plaintiffs' counsel presented the court with the seven Stand–Alone Settlements and proposed making a joint mailing of notice to the class members with the Global Settlement since the definitions of the class and the claims released were identical in the Global and the Stand Alone Settlements. On the understanding that the Stand Alone Settlements would meet parity with the Global Settlement in terms of compensation to class members, the Court granted preliminary approval to those seven additional settlements. Further, at the December 1998 hearing, the Court granted preliminary approval to a supplement to the Global Settlement which enhanced the recovery to the class.

The parties sent direct mail notice to the class—persons with over 1 million unique tax IDs—regarding the terms of the eight settlements and the fairness hearing set for April 5, 1999. At the fairness hearing, various parties appeared to voice objections, notably: (1) NationsBank, a fiduciary for thousands of class members; (2) Jack Corman, a working interest owner who believed his compensation was inadequate; and (3) Andre Toce, counsel in a related Louisiana state court action, who intended to opt out of the settlement for his entire class certified in the Louisiana state court. During the five-day hearing, plaintiffs' counsel presented expert witnesses in support of the settlement and their fee requests. Objectors were allowed to ask questions of the Court, witnesses, and counsel, and were frequently allowed to

cross-examine witnesses.[6] Based on the record formed at the two fairness hearings and based on the submissions to the Court, the Court now considers the motions for approval of the eight settlement agreements.

## B. Crude Oil Marketing and the Crux of Plaintiffs' Claims

Some background information about the oil industry—in particular, about the movement of crude oil from the well or "lease" to the trading centers—is necessary to put in context the issues raised in this litigation. Primarily, it is important to understand the kinds of transactions [7] that take place at two transfer points: (1) at the lease, where oil is transferred from the well into a transportation system of some type (i.e., a truck or pipeline), and (2) at the trading center, where the oil is received from an inbound pipeline and transferred into a buyer's possession for transport to a refinery.

To begin, in cooperation with various royalty and working interest owners, an operator extracts crude oil from the ground at the lease. Once produced at the lease, oil may be transported to a trading center where refineries can purchase the crude oil they need to supply their refineries. There is a network of pipelines and trucking services spread across the producing areas of the United States for the purpose of transporting crude oil from the lease to the six major trading centers—the most active ones being at Cushing, Oklahoma and Midland, Texas. Several large "trunk" pipelines run from the trading centers to major fields of production. For example, a trunk line runs from the Midland trading center to the Permian Basin in western Texas to carry primarily two

6. One objector, Corman, presented testimony of his own. The Court required Class Members with objections to one or more of the settlements to file written Objections by March 5, 1999. The Court has considered the timely written Objections, which are the only "live" Objections. At the fairness hearing, the Court invited full participation by Class Members, including some who commented on issues that they had not preserved in timely written Objections. In reaching its judgment on the settlements, the Court has tried to consider all issues raised at the fairness hearing. However, the Court's willingness to listen does not mean that a Class Member has a live Objection except as to grounds he or she fairly raised in a timely written Objection.

7. As emphasized by Godfrey, counsel for plaintiffs in the Texas Suit, these transactions need not be characterized as "sales;" in fact, their characterization as "sales" would be inconsistent with the cause of action upon which Godfrey primarily relied while prosecuting his case. On the contrary, Kipple, counsel in *McMahon*, brought antitrust claims related to this transaction and therefore characterization of the transaction as a "sale" is consistent with his theory of recovery. According to the defendants, whether or not a sale occurs at the lease depends upon the terms of the applicable contractual instrument.

types of oil—West Texas Intermediate ("WTI") and West Texas Sour ("WTS").[8] From these trunk lines, smaller pipelines branch out to various fields and wells to facilitate gathering. At wells which are not served by a pipeline, it is necessary to use trucks to transport the oil to one of the trunk pipelines.

At the trading centers, oil is sold at a price which unquestionably represents the actual market value of the oil at those trading centers. The market price at the trading center is certainly a reliable gauge of market value because hundreds of thousands of barrels are purchased each day at these centers by numerous refiners which compete for these barrels. The prices for these transactions are public: each day, Platt's, a division of Standard & Poor's, reports the prevailing price for various grades of oil at the trading centers. Moreover, since the mid–1980's, the market price at Cushing, Oklahoma has essentially been tied to the New York Mercantile Exchange ("NYMEX") where investors trade about 100 million "paper" barrels each day.[9] On the NYMEX, investors can purchase barrels of WTI to be delivered at Cushing within a period as short as 30 days. The NYMEX and Platt's price for WTI at Cushing tend to move in tandem as the actual market value of crude oil fluctuates. Godfrey's expert economist, Dr. Jeffrey Leitzinger, indicated that some defendants themselves rely upon the NYMEX price in arriving at the actual fair market value of oil in their own operations.

Theoretically, the NYMEX price may be tied not only to the actual value of WTI at Cushing but also to the actual value of any grade of oil at any location in the system. By using the NYMEX or other trading center price as a benchmark price and by adjusting that price for location and quality

differentials, plaintiffs claim it is possible to estimate the market value of any type of oil at any trading center or at the lease itself. This method may be referred to as the "trading center method." In fact, in 1993, when Atlantic Richfield decided that it had underpaid royalties since 1986, it made its determination in light of the fact that a trading center method revealed it had made systematic underpayments. For its future payments, Atlantic Richfield adopted a formula for calculating royalties which implemented the trading center or "net-back" method.[10]

Defendants contend that there is a competitive market at the lease and that the trading center method overstates value at the lease by failing to recognize individual supply and demand conditions, and by failing to recognize the role of downstream value-adding functions.

The trading center method plays a critical role in the present litigation because the defendants' payments for lease oil are less than the market value at the trading centers. At the lease, the producer either sells crude oil to a transporter or simply transfers the oil into its own pipeline.[11] Also, at the lease, the value of crude oil sold or transferred has been historically stated in terms of posted prices. Posted prices are the prices which purchasing oil companies publish to express the amount that the company is willing to pay for crude oil at the lease. The parties disagree as to whether these posted prices reflect crude oil's actual market value at the lease: ultimately, this disagreement was the genesis of all of these suits.

The market value of crude oil at the lease is important to the plaintiffs in this action because, they contend, as royalty and working interest owners, they are entitled to payments based upon the oil's value at the lease.[12] When the lessee pays royalties

8. WTI is a "sweet" oil, and WTS a "sour" oil. Sweet oil has a lower level of sulfur and is more desirable because sulfur makes the refining process more expensive.

9. Only about 600,000 actual or "wet" barrels are traded each day at Cushing.

10. Counsel for Atlantic Richfield testified that the company pays royalties based either upon actual proceeds from the sale of oil or upon a net-back

calculation using the Platt's price. As mentioned, the NYMEX and Platt's prices tend to move in tandem.

11. Most of the large defendant producers are integrated oil companies; that is, they search for oil, produce it, transport it, refine it, and finally sell it as gasoline and other products.

12. Of course, Defendants argue that a royalty owner's right is actually governed by the terms of

based on posted price, the less the posted price, the less money a class member receives, and, if the posted price is less than the oil's fair market value at the lease, the class member is getting paid less than he would get if the oil were sold in a competitive marketplace at the lease. A simplified example will illustrate. Suppose the NYMEX market price for WTI at Cushing is $15/barrel, that the value of moving the oil from the lease to Cushing is $1/barrel, and that the operator's posted price is $13/barrel. On a particular day, the operator, an integrated oil company, produces 8 barrels on the lease and transports it to its refinery. The class member, a royalty owner with a 1/8 interest in the production, is entitled to one barrel on this day. The operator pays the posted price of $13 for the barrel, but the class member asserts that he should be paid $14 because, considering the price for oil at Cushing ($15) and the value of transportation ($1), he believes that $14 is the actual market value of the oil at the lease. In short, the defendant wants to rely on its posted price, but the class member wants to rely on a price calculated by using the NYMEX price as the starting benchmark.

The nature of the class members' various rights to the production bears description since those rights are the foundation of this litigation. Several entities usually have some kind of right to a percentage of the oil itself, to a price per barrel of oil produced, or to the market value of the oil at the lease; these entities include the original owner of the minerals who has exchanged those rights for a royalty, owners of overriding royalties who have been promised a fractional return by a working interest owner, non-operator working interests who have invested in the project, and the operator working interest. For the purposes of this litigation, two groups of rights have played a significant role in reaching the proposed settlements: (1) the kind of right that arises from the lessor-lessee relationship between a royalty owner and a defendant who has signed a lease obligating it to share a fraction of either the oil or its value, and the similar right that arises in favor of overriding royalty owners (the "Lease Claims"); and, (2) the kind of right that arises, on behalf of all the non-operator working interests and royalty owners, due to the existence of antitrust statutes which prohibit others from engaging in anticompetitive conspiracies (the "Antitrust Claims"). That is, while all owners have a right to the payment of their share based on a price free of anticompetitive conspiratorial behavior, most royalty owners additionally have rights that arise from their lessee-lessor relationship with a defendant.[13] All class members have Antitrust Claims; only the lessor royalty owners have Lease Claims.[14]

Finally, despite the difference in the legal basis of the claims, the factual basis of all of the claims is quite similar. Both the class members with Lease Claims and the class members with solely Antitrust Claims assert that it was wrong for the defendants to pay them their percentage of the value of oil production based on posted prices since those posted prices did not accurately reflect the fair market value of the oil at the lease. While this assertion will be explained in detail below, a preliminary sketch of the issues will be helpful. Since value is added to oil by its transport from the lease to the trading center, it is understandable that there is a difference between its market price at the trading center and its market price at the lease—according to the defendants, such a differential may be regarded as the wholesale margin. And, consequently, it is understandable that there is a differential between the market price at the trading center and

the lease contract and often is the right to take delivery of a percentage of the oil at the lease rather than the right to the value of that oil.

13. Under the settlements, entities with Lease Claims have been categorized as "First Tier Royalties," whereas those which do not have such claims are categorized as "Second Tier Royalties" and "Working Interest Owners" (herein referred to collectively as "Second Tier Claimants.") Both First Tier Royalties and Second Tier Claimants have Antitrust Claims.

14. For the first time in nearly five years of litigation, attorneys (for objectors) presented to a court the argument that all non-operator working interests also have a strong claim under the theory that the Joint Operating Agreement or Division Order under which their oil is sold entitles them to the highest and best price for oil at the lease; in other words, these attorneys proposed that all class members had a right to payment on the same terms as those parties with Lease Claims. This is explained more fully below.

the posted price (which purports to represent the oil's value at the lease.) However, plaintiffs contend that this differential between the market price at the trading center and posted price at the lease was too large because the defendants consistently set their posted prices below the actual market value at the lease; and, assert the plaintiffs, since the posted prices were too low, their fractional payments based on posted prices were likewise too low. In sum, there are two fundamental issues common to both the Lease and Antitrust Claims. The common factual issue is: was the differential between the market price at the trading center and the posted price greater than the value added by its movement to the market center? The common legal issue is: if, as plaintiffs' empirical data suggests, this differential was greater than the value added, who was entitled to the profit? Or, in terms of the hypothetical, is there an extra $1 in the wholesale margin, and, if there is, to whom does the $1 belong?

## C. Competing Suits and Claims Brought Seeking to Recover the Alleged Differential between Market Price and Posted Price

In 1992, Phillips Petroleum announced that it was going to cease paying bonuses and increase its posted price to more accurately reflect the value of crude oil at the lease, by reducing the gap between its field postings and NYMEX prices. In the following year, Atlantic Richfield sent checks totaling $19.8 million to its royalty owners in order to reimburse them for underpayments since 1986. These and other actions gave rise to the current wave of litigation seeking to recover a portion of the differential between posted and market prices. Claiming a right to the hypothetical's $1/barrel, these suits aimed to test various legal theories of liability under commercial and oil and gas law while seeking to recover roughly $1 billion in damages.

On behalf of a putative class of Texas royalty owners, Lee Godfrey filed suit in Texas in 1995, asserting state law Lease Claims—primarily, breach of contract and breach of implied covenants under the lease agreements. Simply put, the Lease Claims depend on the following argument: the lease

between the royalty owner (lessor) and producer (lessee) imposes a duty on the producer to pay royalties based on the best and highest price for the oil at the lease (i.e., the fair market value); for over a decade, the defendant producers have paid royalties based on posted prices that did not reflect the fair market value of the oil at the lease; therefore, the producer has breached its duty under the lease and owes the royalty owner for his portion of the differential between the posted price and the fair market value of the oil at the lease. Notably, under this theory, at the lease there is no sale of oil, but rather simply a transfer of oil and an accounting for that transfer. Soon, additional state court cases raising similar Lease Claims were filed on behalf of royalty owners, such as *Engwall v. Amerada Hess* in New Mexico and *Kershaw v. Amoco* in Oklahoma. In all of these cases, the defendants denied plaintiffs' contractual arguments.

Then, in April 1996, the *McMahon* plaintiffs filed the first federal lawsuit which asserted Antitrust Claims on behalf of a nationwide class of royalty owners and working interests. These Antitrust Claims differ from the Lease Claims in that they do not depend on the lessee-lessor relationship to impose a duty on a defendant to pay the royalty owner the best and highest price available; rather, the Antitrust Claims depend on proving that defendant oil producers and transporters entered a price-fixing conspiracy to depress posted prices (upon which they based their purchase payments to both royalty and working interest owners) and thereby depressed the market price for oil at the lease.

The antitrust allegations are best stated in the MDL–1206 Consolidated Complaint wherein the plaintiffs have identified the kind of price-fixing behavior they suspect Defendants engaged in. In Orders Nos. 8 and 9, the Court has already summarized three examples of the kind of conspiracies that could have depressed posted prices. *See In re Lease Oil Antitrust Litig. II*, 1998 WL 469840 (S.D.Tex.); *In re Lease Oil Antitrust Litig. II*, 1998 WL 690947 (S.D.Tex.). Here, the primary example bears repeating in order to clarify the nature of the Antitrust Claims and their difference from the Lease Claims.

Allegedly, in order to depress posted prices, defendants have employed long-term buy/sell and "overall balance" agreements.[15] While there are some variations in how these agreements are allegedly carried out, the basic mechanism for depressing pricing may be illustrated by considering a typical scheme which occurs in the following four transactions—one contractual exchange, two sham sales at posted prices, and one arm's length sale on the market:

#### (1) Contractual Transaction at the Lease Location

The Defendant Operator takes possession of all of the oil produced at the lease either because: (1) the Plaintiff turns its fractional portion over to the Operator (typically through a division order) for marketing purposes, or (2) in the case of royalty owners, the lease grants the Operator the option to market all the oil produced and simply pay the royalty owner a percentage of the proceeds from the first sale.

#### (2) First Sale: At the Lease Location

Operator sells the oil to Transporter (another Defendant who will transport the oil to the Trading Center) at the lease, based on the Posted Price. Plaintiff's royalty or working interest payment is calculated from this price.

#### (3) Second Sale: At the Trading Center

After Transporter has taken the oil to the Trading Center, Transporter sells the oil back to the Operator at the same Posted Price plus the actual cost of the transportation services.

#### (4) Third Sale: On the Market

Operator sells the oil to an arm's length Buyer on the market at Market Price (which exceeds the Posted Price plus transportation costs), reaping anticompetitive profit.

To an outside viewer of these transactions, it would appear that both the Operator at Stage 1 and the Transporter at Stage 2 made sales at too low of a price since they were based on the Posted Price rather than market value. However, the Operator and Transporter made these "poor bargains" because the two had an agreement to make both of those sales based on the Posted Price in order to allow the Operator to ultimately gain an anticompetitive profit at the trading center. In this way, the Operator gains an anticompetitive profit (i.e., Market Price minus Posted Price and transportation costs) without having to give the Plaintiff its contractual share of that profit. Further, the Operator and Transporter maintain this short-term agreement because it is supported by a long-term agreement to reach an "overall balance" in their transactions: that is, since Transporter has done Operator a favor concerning a certain quantum of oil in this transaction, Producer and Transporter will exchange roles in a separate transaction for the same quantum of oil and thereby balance their favors.[16]

Now, these transactions and agreements are repeated thousands of times because they govern every exchange between the Defendant oil companies (which usually serve both as Operators and as Transporters) except for those exchanges made on the market at Stage 4. By consistently abiding by such agreements, all of the conspiring oil companies allegedly gain the Market Price profit at the trading center while making it appear that the actual competitive price at the lease is the Posted Price, since all conspiring companies are allegedly paying the Posted Price at the lease.

Such allegations of price-fixing schemes are the crux of the Antitrust Claims and the basis of the *McMahon* plaintiffs' suit. After *McMahon*, several other attorneys filed competing antitrust suits, both in federal and state court. Notably, in September 1996, a group of attorneys filed a putative class action in Alabama state court, *E.M. Lovelace et al. v. Amerada Hess Corporation et al.*, alleging that 24 oil companies violated the separate antitrust statutes of each of the fifty

---

15. The following description is, of course, a description of the allegations and does not constitute a finding of fact for any purpose.

16. In making this overall balance, the oil companies will negotiate the "Delta Factor" which compensates each company for any qualitative difference between the oil which is traded in the off-setting transactions.

states. *Lovelace* was removed to federal court, and the plaintiffs sought a remand, arguing that federal antitrust claims were not at issue in their case since their claims were based strictly on state statutes. In April 1997, the federal court remanded *Lovelace*, and, the following month, Mobil and counsel for *Lovelace* plaintiffs announced that they had reached a settlement to dismiss all posted price claims of a nationwide class against Mobil. The Alabama state court ordered that notice of the settlement be sent to class members.[17]

Meanwhile, the magistrate presiding over *McMahon* had recommended that those plaintiffs replead their complaint because it was too vague.[18] The *McMahon* plaintiffs soon amended their pleadings. In June 1997, Godfrey and Kipple, on behalf of their putative classes in the Texas Suit and in *McMahon* respectively, entered a term sheet with 23 defendants. This Term Sheet was a precursor to the instant Global Settlement, and provided for a recovery of about $95 million to a nationwide class for the release of all underpayment claims (including, of course, the Lease Claims and Antitrust Claims.) In November 1997, after a more accurate tally of the number of barrels involved, Godfrey and Kipple negotiated a larger recovery for the putative class and entered the first version of the Global Settlement, providing for a payment of $142.9 million from 24 defendants. The parties to the Global Settlement presented it to the magistrate in *McMahon*. Since the JPML was considering the transfer of various federal antitrust suits to a singe court, the magistrate stayed her consideration of the proposed Global Settlement.

On January 14, 1998, the JPML began transferring cases to this Court for coordinated pretrial proceedings. In April 1998, this Court, in order to secure its jurisdiction, enjoined all Defendants (except Mobil) and all Plaintiffs in MDL–1206 from entering settlements agreements which purported to settle any of the federal antitrust claims in this litigation without first gaining approval of the

Court. (See Order No. 2.) Beginning with the initial pretrial conference in May, this litigation proceeded on essentially three tracks. The Settling Plaintiffs and Settling Defendants re-negotiated their Global Settlement and prepared for a fairness hearing; the Nonsettling Plaintiffs and Nonsettling Defendants proceeded on a "litigation track," preparing both to oppose the Global Settlement and for a litigation class certification hearing; Mobil proceeded to argue that its *Lovelace* settlement barred suit by plaintiffs in MDL–1206. In June, the Court ruled that the *Lovelace* settlement does not have preclusive effect with respect to the federal antitrust claims which it purported to release. (*See* Order No. 21., *In re Lease Oil Antitrust Litig.*, 16 F.Supp.2d 744 (S.D.Tex.1998)). Mobil, therefore, remained a Nonsettling Defendant for purposes of MDL–1206, at least during the pendency of its appeal of Order No. 21.

In June 1998, Godfrey and Kipple renegotiated the Global Settlement, arriving at terms which provided a higher per barrel recovery to the class. The latest Global Settlement reduced the consideration to the class to $135.5 million, but it also excluded state entities from the class. In October 1998, the Court held a four-day preliminary fairness hearing where the Nonsettling Plaintiffs strenuously objected to the terms of the Global Settlement, arguing basically that class members were not receiving sufficient consideration for their Antitrust Claims. Over these objections, the Court granted preliminary approval. In November, all parties in MDL–1206 engaged in negotiations which yielded improvements to the Global Settlement and also seven Stand Alone Settlements with the seven remaining Nonsettling Defendants. The Global Settlement was increased from $135.5 million to $164.2 million, which included terms which nearly doubled the recovery by putative class members who relied primarily on the antitrust theory of recovery. Counsel for Nonsettling Plaintiffs agreed that this final version of the Global Settlement was adequate.

---

17. Mobil was to pay $15 million, give the *Lovelace* attorneys access to documents, and alter its method of calculating the first sale price for oil. *Lovelace* attorneys were awarded over 40% of the settlement fund.

18. The presiding judge, Judge Rainey, adopted this recommendation as his own order in October 1997.

Further, various attorneys in the plaintiff's steering committee negotiated the following Stand Alone Settlements, releasing all underpayment claims for a nationwide class of royalty and working interest owners: (1) with Exxon for $10 million; (2) with Fina for $5 million; (3) with Atlantic Richfield for $600,000; (4) with Phibro/Basis for $350,000; (5) with Apache for $350,000; (6) with Koch for $11.025 million; and (7) with Mobil for $2 million. In December 1998, this Court gave preliminary approval to all eight of these settlements, and the parties proceeded to send about 2.8 million notices to potential class members.

## D. Terms of the Global and Stand Alone Settlements

The Stand Alone Settlements adopt the basic structure of the Global Settlement with limited exceptions, using the same definitions and releasing the same set of underpayment claims for the same class of royalty and working interest owners. The important difference between the Global and Stand Alone Settlements is the consideration provided and the rate of recovery to certain class members for their royalty and/or working interest barrels. Thus, the Court will first describe the terms of the Global Settlement which are applicable to all of the settlements.

The Global Settlement releases all claims against Settling Defendants arising under state or federal law that are "based upon a Per–Barrel Valuation used by a Defendant in making payments between January 1, 1986 and September 30, 1998." (Global Settlement, 1.15.) It settles these claims on behalf of a nationwide class of plaintiffs who, during the relevant period, received payments from Defendants "that were either (a) payments directly attributable to royalty interests, overriding royalty interests, working interests or other similar interests in the production of Domestic Crude Oil, or (b) payments for Lease Purchases of Domestic Crude Oil." (Id., 1.14.) From this class, there were several exclusions (see, Id. at 1.14(b)), one of which is instrumental in making the settle-

ment feasible: the class excludes "working interest owners, solely in their capacity as working interest owners, who engaged in buy/sell or exchange agreements with any Defendant or its Affiliates based upon posted prices." (Id. at 1.14(b)(vi).) This distinction, proposed by the antitrust claimants, aims to separate those working interest owners who *could be* associated with the alleged conspiracy from those who were clearly distant from any such conspiracy. Drawing this line has been one of the fundamental (and unavoidable) challenges in the litigation.

Further, the Global Settlement provides for the intraclass allocation of the net sum of $164.2 million. The Global Settlement makes three crucial distinctions in determining how the net settlement fund (the gross fund minus fees and expenses) will be allocated. First, sour barrels will be compensated at a rate of 3.5 times the rate of sweet barrels; this allocation decision was not contested at either the preliminary or final hearings and is justified by suggested empirical data reviewed by Dr. Leitzinger which shows that sour barrels tended to be undervalued more than sweet barrels.[19] Second, approximately 90% of the fund will go to "late" barrels and 10% to "early" barrels. "Late" barrels are those produced after March 1992, and therefore generally are not subject to the statute of limitations defense; "early" barrels are those produced from January 1986 to March 1992. This allocation decision was contested at the preliminary fairness hearing of October 1998, but attracted little attention by objectors at the April 1999 hearing. Finally, 70% of the fund will go to royalty owners who have both Lease Claims and Antitrust Claims, while 30% will go to those owners who may raise only Antitrust Claims.

This final allocation decision—essentially, between the Lease Claims and the Antitrust Claims—was highly contested at the preliminary settlement hearing of October 1998 (but not at the hearing of December 1998 when the allocation shifted from 82:18 to 70:30)[20] and was also the focus of objectors at the final fairness hearing. Therefore, the Global

**19.** Of course, Defendants maintain that none of the barrels were undervalued at all. In order to make the discussion of the settlements more comprehensible, the Court will explain the underlying facts as if there was an undervaluation,

although the factual and legal issues as to undervaluation remain disputed.

**20.** At the time of the October 1998 preliminary fairness hearing, the settlement fund was to be

Settlement's mechanism for effecting this allocation and its terminology must be reviewed. The Global Settlement divides the class members into three groups, depending on the nature of their interests and their corresponding legal theories of recovery. Basically, there are three groups with distinct interests, but these three groups form only two distinct groups having significantly different legal claims. "First–Tier Royalty Payees" receive payments from a Settling Defendant and own royalty interests in properties that a Settling Defendant operates (i.e., a defendant producer's equity royalty burden, plus those non-operator royalty burdens that the defendant pays as operator). "Second–Tier Royalty Payees" own other royalty interests that a Settling Defendant pays (e.g., as an accommodation to a crude-selling working interest owner). "Working Interest Payees" own working interests and receive payments from a Settling Defendant, usually via an outright sale, a transfer under a division order, or a transfer under a Joint Operating Agreement. (*See*, Settlement Agreement, 1.38, 1.39, 1.40). So, there are three groups of interests—First-Tier Royalty, Second–Tier Royalty, and Working Interest—but, with respect to the types of legal claims they may pursue, they form just two significant subgroups: First–Tier Royalties may bring Lease Claims and Antitrust Claims, whereas Second–Tier Royalties and Working Interest Owners may bring only Antitrust Claims.[21] Thus, the Settlement Agreement allocates 70% of the fund to First Tier Royalties and 30% to Second Tier Royalties and Working Interest Owners (collectively, "Second Tier Claimants").

All of the Stand Alone Settlements use the same definitions and release the same type of claims as the Global. While the Stand Alone Settlements' methods of allocation usually vary from the Global's method, they generally intend to maintain parity with the Global Settlement in terms of recovery to the class members. The Exxon Settlement allocates 82% of the settlement fund to First Tier Royalties and 18% to Second Tier Claimants. The Fina and Apache Settlements match the Global—70% to First Tier Royalties, and 30% to Second Tier Claimants. Since Atlantic Richfield already voluntarily paid its royalty owners in 1993, all of its consideration goes to Working Interests. Since Phibro/Basis has no royalty owners, all of its consideration likewise goes to Working Interests. Koch makes comparable payments to First Tier Royalties and allocate the rest to Second Tier Claimants. Finally, Mobil, a sui generis case, pays $2 million to its payees.

### E. Overview of Issues Raised at the Fairness Hearing

As mentioned, all counsel on the plaintiff's committee in MDL–1206 support the approval of the eight settlement agreements presented to the Court. NationsBank, Corman and others have filed various Objections (collectively, "the Objectors"), and argued both their Objections and other points at the fairness hearing. The great majority of the Objections had to do with the claim form procedure which certain Second Tier Claimants were originally required to follow. As explained below in Part III.E, when these problems with the claim procedure became evident, the Court and Plaintiff's counsel revised the procedure in order to cure those problems. (*See* Order Nos. 60, 65, and 68.) Further, the Objectors primarily challenged the allocation of settlement funds between First Tier Royalties and Second Tier Claimants and certain aspects of the method of calculating damages.

### III. DISCUSSION

### A. Jurisdiction to Approve the Settlement Agreements

Pursuant to 28 U.S.C. § 1407, the JPML has transferred fifteen federal suits to this

---

divided 82% to Lease Claims and 18% to Antitrust Claims; after the renegotiation of the Global Settlement, the division is 70% and 30%, respectively. This reallocation and greater return to the Antitrust Claims satisfied counsel for Nonsettling Plaintiffs, who accordingly withdrew their objections to the Global Settlement at the December 1998 hearing.

21. At the final fairness hearing the objection was raised for the first time that Working Interest Owners have, in addition to their Antitrust Claims, a legitimate claim under a theory of a breach of an implied marketing duty under a division order or joint operating agreement. When addressing objections, below, the Court explains why this eleventh hour objection is specious.

Court for coordinated pretrial proceedings. The JPML explained its transfer under § 1407 by finding that the actions "are premised on allegations that defendants conspired, in violation of antitrust laws, to fix prices paid by them for the first purchases of lease production oil from plaintiffs and putative class members." (See e.g. JPML Transfer Order of January 14, 1998.) This Court unquestionably exercises federal question jurisdiction over the federal antitrust claims. *See Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985).

■ Many of these suits include, in addition to federal antitrust allegations, common law and statutory claims brought under the laws of various states—including Louisiana, Mississippi, Wyoming, and Alabama. A federal district court has supplemental jurisdiction over state law claims which are so related to the claim in the action within the court's original jurisdiction that they form part of the same case or controversy. 28 U.S.C. § 1367. The doctrine allows a court to hear claims over which it does not original jurisdiction provided those claims are "part of the same case or controversy under Article III" as the claims that support the court's original jurisdiction, and it is a doctrine of discretion. 28 U.S.C. § 1367(a); *see also United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)("common nucleus of operative fact"). A number of factors exist to guide a district court in the exercise of this discretion, such as: (1) the degree to which state issues dominate "in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought;" (2) the policy of avoiding needless decisions of state law "as a matter of comity and to promote justice between the parties, by procuring for them a surefooted reading of applicable law;" and (3) "judicial economy, convenience, and fairness to the litigants." *Laird v. Board of Trustees of Institutions of Higher Learning,* 721 F.2d 529, 534–35 (5th Cir.1983) (citations omitted); *see also* 28 U.S.C. § 1367(c) (listing grounds for declining supplemental jurisdiction).

■ These factors generally militate in favor of this Court exercising supplemental jurisdiction over the state law claims brought in the consolidated actions. Those claims are for breach of contract, breach of implied covenants, fraud, conversion, and violations of state mineral codes. Like the federal antitrust claims, those state law claims ultimately depend on making a showing that the Defendants' payments did not reflect crude oil's actual market value at the lease. Making that showing would require a considerable effort of discovering documents and analyzing the Defendants' marketing and trading behavior over the twelve-year period. While the duties under the federal and state causes of action differ, they are "part of the same case or controversy" and share a common nucleus of operative fact. For these reasons, the Court FINDS it is proper to exercise supplemental jurisdiction over the pendent state law claims raised in the consolidated actions. *See e.g., In re Prudential Ins. Co. America Sales Litigation,* 148 F.3d 283, 300–03 (3rd Cir. 1998)(where plaintiffs' primary claims were state law claims for fraud and secondary claims were for violations of the Securities and Exchange Act, exercise of supplemental jurisdiction was proper since there was a common scheme to defraud.)

■ The eight settlement agreements aim to release not only the claims actually raised in these consolidated actions, but also to release all claims against Settling Defendants arising under state or federal law that are based upon a per-barrel valuation used by Defendants in making payments during the relevant time period. Where class members have been notified that their state law claims might be released, a federal court "may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint." *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 221 (5th Cir. 1981) (citations omitted). Further, "it has been held that even when the court does not have power to adjudicate a claim, it may still approve release of that claim as a condition of settlement of an action before it." *Id.; see also, Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996); *Grimes v. Vitalink Communications Corp.,* 17 F.3d 1553, 1556 (3rd

418

Cir.), *cert. denied,* 513 U.S. 986, 115 S.Ct. 480, 130 L.Ed.2d 393 (1994). Since the various state law claims based on per-barrel valuations by Defendants arise from a common nucleus of operative fact, there is no question that the claims released by the settlement agreements could have been alleged in connection with the claims brought in the Consolidated Complaint. Accordingly, the Court FINDS that it has jurisdiction to approve settlements which release all of the claims that the Global and Stand Alone Settlements intend to release.[22]

### B. Standard of Review: Approval of a Class Action Settlement

In *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), the Supreme Court discussed the special problems encountered with settlement classes and the approval of class action settlements. Although as a general matter the *Amchem* court approved the certification of classes for settlement purposes only, it cautioned that the certification inquiry is still governed by Rule 23(a) and (b), and that federal courts "lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper." *Amchem,* 521 U.S. 591, 117 S.Ct. at 2248–49.

■ Consequently, a district court must first find that a class satisfies the requirements of Rule 23, regardless of whether it is certifying the class for trial or for settlement. *Amchem,* 521 U.S. 591, 117 S.Ct. at 2248 ("The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments—shorn of utility—in the settlement class context"). Nevertheless, the district court may take the proposed settlement into consideration when examining the question of certification. *Amchem,* 521 U.S. 591, 117 S.Ct. at 2248. In particular, the *Amchem* Court held that "a district court [determining whether to certify a class for settlement purposes only] need

not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Id.* Yet, at the same time, the Court noted that "other specifications of the rule—those designed to protect absentees by blocking unwarranted or over broad class definitions—demand undiluted, even heightened, attention in the settlement context." *Id.* Most importantly, the Court emphasized the importance of applying the class certification requirements of Rules 23(a) and (b) separately from its fairness determination under Rule 23(e). The Court noted that "[i]f a common interest in a fair compromise could satisfy the predominance requirement of Rule 23(b)(3), that vital prescription would be stripped of any meaning in the settlement context." *Id.,* 521 U.S. 591, 117 S.Ct. at 2249–50. Also, the Court stressed the requirements found under Rule 23(a), in particular the stricture that "the representative parties will fairly and adequately protect the interests of the class." Indeed, the key to *Amchem* appears to be the careful inquiry into adequacy of representation. *Id.,* 521 U.S. 591, 117 S.Ct. at 2248 ("Subdivisions (a) and (b) [of Rule 23] focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed.")

Thus, the Court will proceed to determine whether the settlement class satisfies the relevant requirements of Rule 23(a) and (b). Since the settlement class is defined in the same terms in the Global and Stand Alone Settlements, this discussion will be applicable to all eight settlements. The Court will then determine whether the notice and claim procedure satisfied due process and Rule 23. Finally, the Court will discuss whether each of the eight settlements satisfies Rule 23(e)'s requirement that the terms of the settlement be fair, adequate and reasonable.

22. The Toce Group's arguments concerning the importance of Louisiana's unique lease cancellation remedy will be taken up in the analysis of objections to the adequacy of representation by Settling Plaintiffs' counsel. While such objections are sometimes addressed under the rubrics of "predominance," "typicality" or "manageabil-ity," considering the thrust of the Toce Group's argument and the fact that "manageability" is not a criteria for approval of a settlement, it seems most appropriate to consider their arguments as alleging a potential conflict of interest within the class which class counsel have not adequately handled.

## C. Certification of the MDL–1206 Settlement Class [23]

### 1. Rule 23(a) and (b) Prerequisites in General

■ Plaintiffs have the burden of establishing that each of the relevant prerequisites to class action certification is satisfied, *EEOC v. D.H. Holmes Co.*, 556 F.2d 787, 791 (5th Cir.1977), *cert. denied*, 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978), and the court must conduct a rigorous inquiry before granting class certification in order to ensure that the requirements of Rule 23 are met. *See General Telephone Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982). In evaluating a motion for class certification, however, the court does not have the authority to conduct a preliminary inquiry into the merits of the case, and hence the substantive allegations contained in the complaint are accepted as true. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974) Still, because of the important role that class actions play in the private enforcement of the antitrust statutes, courts resolve doubts about whether a class should be created in favor of certification. *See In re Potash Antitrust Litigation*, 159 F.R.D. 682, 688–89 (D.Minn.1995); *In re Infant Formula Antitrust Litigation*, 1992 WL 503465, at *3 (N.D.Fla. Jan. 13, 1992); *Cumberland Farms, Inc. v. Browning–Ferris Indus., Inc.*, 120 F.R.D. 642, 645 (E.D.Pa.1988); *In re South Central States Bakery Prods. Antitrust Litigation*, 86 F.R.D. 407, 423 (M.D.La.1980); *In re Corrugated Container Antitrust Litigation*, 80 F.R.D. 244, 252 (S.D.Tex.1978).

"Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiff's and counsel's ability to fairly and adequately protect class interests." *In re General Motors Corp. Pick-Up Truck Fuel Tank Litigation*, 55 F.3d 768, 799 (3rd Cir.1995). In order to be certified, a class must satisfy the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. If the Rule 23(a) criteria are satisfied, the court must also find that the class fits within one of the three categories of class actions defined in Rule 23(b). *In re Prudential Ins. Co. America Sales Litigation*, 148 F.3d 283, 309 (3rd Cir.1998).

■ In this instance the parties seek to certify the class under Rule 23(b)(3). In order to pass muster under Rule 23(b)(3), this Court must determine that common questions of law or fact predominate and that the class action mechanism is the superior method for adjudicating the case. *Id.* The requirements of subsections (a) and (b) are designed to insure that a proposed class has "sufficient unity so that absent class members can fairly be bound by decisions of class representatives." *Amchem*, 521 U.S. 591, 117 S.Ct. at 2248. As noted, these class certification requirements are to be determined independently from the court's determination of the "fairness" of the proposed settlement under Rule 23(e). *Amchem*, 521 U.S. 591, 117 S.Ct. at 2248 (Rule 23(e) "was designed to function as an additional requirement, not a superseding direction, for the 'class action' to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b).").

### 2. Rule 23(a) Prerequisites

Rule 23(a) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

The first two prerequisites of Rule 23(a), joinder impracticability and common questions, focus on characteristics of the class. 1 Newberg & Conte, *Newberg on Class Actions* § 3.13 at 3–71 (3rd ed.1992). The second two prerequisites, typicality and adequate representation, focus instead on the desired characteristics of the class representative. *Id.* That is, the first two ask whether the class' claims are proper for class treat-

---

**23.** This term means the settlement class as defined in all eight of the settlements.

ment, whereas the second two ask whether the representatives are proper to represent the class.

### a. Rule 23(a)(1): Numerosity

■ The Court must find that the class is "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1); *see e.g. Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir.1980). Here, there are over one million members in the MDL–1206 settlement class. Even the Stand Alone Settlements each encompass many thousand payees. No one has argued that numerosity poses a problem to class certification, and the Court FINDS that this criteria is unquestionably satisfied.

### b. Rule 23(a)(2): Common Questions of Law or Fact

■ Under Rule 23(a)(2), plaintiffs may bring a class action "only if ... there are questions of law or fact common to the class." Although this provision "does not require complete identity of legal claims among the class members," there must be "at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir.1982).

■ In this case, there are several issues whose resolution will affect essentially all of the members in the settlement class. To begin, all members of the proposed settlement class may bring the Antitrust Claims, alleging that Defendants have fixed posted prices below market value. In a discussion of the commonality requirement, the Fifth Circuit has stated that "[i]t is too widely recognized to require citation that antitrust price-fixing cases are particularly suited for class action treatment in spite of the fact that the fact of injury and the amount of damages may require individual proof by class members." *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir.1978). Thus, the Court FINDS that the proposed settlement class meets the Rule 23(a)(2) commonality requirement. Like other district courts, this Court will discuss commonality matters at greater length under Rule 23(b)(3)'s more rigorous "predominance" test. *In re South Central States Bakery Prods. Antitrust Litigation*, 86 F.R.D. 407, 415 (M.D.La.1980); *In re Plywood Anti–Trust Litigation*, 76 F.R.D.

570, 578 (E.D.La.1976); 4 Newberg § 1807 at 18–2; 7A Wright, Miller & Kane, *Federal Practice and Procedure*, § 1763 at 227 (2d ed.1986)("an action is maintainable under Rule 23(b)(3) only if there is a finding that common questions predominate over individual issues. Since this obviously is a more stringent standard than that prescribed by Rule 23(a)(2), subdivision (a)(2) would be satisfied any time the court finds that the subdivision (b)(3) test is met").

### c. Rule 23(a)(3): Typicality

■ In order to maintain a class action, Plaintiffs must show that "the claims or defense of the representative parties are typical of the claims or defenses of the class." Fed. R.Civ.P. 23(a)(3). This requirement "is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *In re Prudential*, 148 F.3d at 311 (citing 1 Newberg § 3.13). The class representatives must "possess the same interest and suffer the same injury as the class members." *East Texas Motor Freight System Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). "The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiffs' claims." *General Telephone Co. of Northwest v. EEOC*, 446 U.S. 318, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980); *see also General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982).

As Professor Newberg explains: "a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." 1 Newberg § 3.13 at 3–76. For example, where a class representative brings a claim of price-fixing in violation of the Sherman Act, such a claim is typical with respect to the class' price-fixing allegations. *Klein v. Henry S. Miller Residential Services, Inc.*, 94 F.R.D. 651, 661 (N.D.Tex.1982); *In re Glassine and Greaseproof Paper Antitrust Litigation*, 88 F.R.D. 302, 304 (E.D.Pa.1980) (claims of plaintiffs

are typical as claim is of injury by purchasing goods under artificial anti-competitive conditions caused by a conspiracy among defendants). "Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns on underlying the individual claims." *In re Prudential,* 148 F.3d at 311 (quoting *Baby Neal v. Casey,* 43 F.3d 48, 58 (3rd Cir.1994)).

The MDL consolidated complaint asserts federal antitrust claims as well as state law claims based on the law of Texas, Louisiana, Mississippi, and Wyoming. Plaintiffs in seven of the suits transferred to this Court for pretrial proceedings have joined in the MDL Complaint.[24] Moreover, counsel for plaintiffs in three related (non-transferred) federal cases [25] and ten related state court cases [26] participated in the negotiation of the eight settlements and support their approval. In total, over 150 class representatives in these twenty suits represented the interests of the absent class members in negotiating and entering the MDL–1206 settlements. This group of representatives included a variety of First Tier Royalties, Second Tier Royalties and Working Interest Owners. All of these representatives could or did bring the federal Antitrust Claims. Also, this group included representatives engaged in posted price liti-

gation in almost every state which produces oil and therefore did or could bring Lease Claims based on state law.

■ In sum, the class representatives hold claims typical of the class members because (1) they all could share (and many in fact did share) the same price-fixing allegations; (2) many shared the same state law claims for breach of an implied duty under a royalty lease or for breach of contract;[27] and (3) all shared the same interest in proving the applicability of a limitations-tolling doctrine such as fraudulent concealment or a discovery rule. Accordingly, the Court FINDS that the settlement classes satisfy the typicality requirement under Rule 23(a)(3).

### d. Rule 23(a)(4): Adequacy of Class Counsel

■ Rule 23(a)(4)'s adequate representation requirement is comprised of essentially two parts—one relating to the class representatives and the other to the class counsel: (1) the counsel must be qualified and experienced, and (2) the representatives must not have antagonistic interests with class members. 1 Newberg at § 3.21 at 1S–113. Courts have developed two tests to analyze the two aspects of Rule 23(a)(4) which Professor Newberg labels the Vigorous Prosecution Test and the No–Conflicts Test. *See*

---

**24.** Those cases are: *McMahon, McMahon II, Nicholson, Bertolet, Cameron Parish, Randolph Energy,* and *Stanley.*

**25.** These cases are: *Williams v. Texaco Inc. et al.,* No. 96–596–RV–C (S.D.Ala.); *Brown v. Amoco et al.,* C–98–217 (S.D.Tex.); *Lovelace v. Amerada Hess Corp. et al.,* No. 2:98CV 285 PG (S.D.Miss.).

**26.** These cases are: the Texas Suit; *State of Texas et al. v. Amerada Hess Corp et al.,* (Travis County, Texas); *State of Texas et al. v. Union Pacific Resources Corp. et al.,* (Travis County, Texas); *Kershaw v. Amoco et al.,* (Seminole County, Oklahoma); *Engwall v. Amerada Hess et al.,* (Chaves County, New Mexico); *Manning v. Texaco et al.,* (Chambers County, Alabama); *Powell v. Occidental et al.,* (Panola County, Texas); *Burton v. Amoco et al.,* (Salt Lake County, Utah); *Lovelace v. Amerada Hess et al.,* (Escambia County, Alabama); *Wilson v. Palmer Petroleum et al.,* (Parish of Point Coupee, Louisiana).

**27.** Further, the problem of differences in state remedies (including lease cancellation in Louisiana, for example) and defenses to those remedies

has been overcome where the plaintiffs all share common federal antitrust claims. For example, in *Sollenbarger v. Mountain States Telephone & Telegraph Co.,* 121 F.R.D. 417 (D.N.M.1988), a class of plaintiffs in a seven state region sued the defendant for violations of the Sherman antitrust act and for common law fraud, and they also argued that their contracts were voidable under state law. The defendant asserted that the class could not meet the typicality requirement because it could raise certain statutory defenses against the state contractual claims depending on which state the plaintiffs resided in. The district court stated that the defendant's "ability to raise a potentially valid defense in some or all of the states for a significant but finite portion of time is not an obstacle to class certification, though. The defense may cause the composition of the class to change significantly at some later date but this does not alter the class certification inquiry. The claims of the named representatives are typical of the class." *Id.* at 426–27.

*Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir.1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975) ("Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class").

### i. Vigorous Prosecution Test

██ "In the absence of a showing to the contrary, the court may generally presume that prosecution of the action will be vigorous." 1 Newberg § 3.42 at 3–220. For example, in *In re Plywood Anti Trust Litigation,* 76 F.R.D. 570, 579 (E.D.La.1976), the court found that class counsel was adequate due to the fact that "many of the attorneys designated by plaintiffs as class counsel have been involved in some of the most significant and difficult class action litigations in recent years."

██ Here, it would be hard to assemble a more qualified group of class counsel than the group of attorneys representing the settlement class. Godfrey's firm, Susman & Godfrey, is one of the premier firms handling complex commercial litigation and class actions. Godfrey himself was the first to file suit on the posted price underpayment theory, and, in the Texas Suit, he had proceeded to the verge of a class certification hearing before entering settlement negotiations. Like Godfrey, the attorneys representing the *McMahon* plaintiffs have had extensive experience in commercial class action suits, including substantial involvement with *Corrugated.* Further, counsel for *Engwall* plaintiffs (a New Mexico state court case which participated in the proposed settlements) conducted significant posted price litigation before entering settlement negotiations, completing a class certification hearing and eventually gaining certification of a class against Mobil. Finally, counsel for plaintiffs

28. Hosie was instrumental in negotiating the December 1998 increase in the Global Settlement for Second Tier Claimants.

29. Etherton's main contribution was in the negotiation of several of the Stand Alone Settlements.

30. NationsBank and Corman made similar arguments at the fairness hearing, which overlapped

in other settling actions are well-qualified for managing complex antitrust litigation. For example, for several years Spencer Hosie[28] litigated underpayment claims on behalf of the State of Alaska with a great deal of success. Rayford Etherton[29] had experience in posted price litigation, having settled with Mobil in Alabama and having gained access to Mobil documents. Since class counsel have such high qualifications and since there has been no proof offered showing otherwise, the Court FINDS that their representation of the class has been vigorous.

### ii. No–Conflicts Test

Various Objectors, most notably NationsBank and Corman, in their Objections and otherwise, have argued that the class has not been adequately represented in reaching the Global Settlement and at least some of the Stand Alone Settlements. The Objectors[30] contend that this inadequacy stems from the fact that there are latent conflicts of interest between subgroups within the class and that this inadequacy is evident in decisions by class counsel as to how to allocate the settlement fund amongst class members.

#### (A) Standard for Adequacy-of-Representation

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. [A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem,* 521 U.S. 591, 117 S.Ct. at 2250–51. While the "adequacy-of-representation" requirement tends to merge with the commonality and typicality requirements, it "also factors in competency and conflicts of class counsel." *Id.,* 521 U.S. 591, 117 S.Ct. at 2251 n. 20.

their written Objections to some extent. For present purposes, the Court will simply refer to the complaining Class Member as an aggregate "Objectors." This does not suggest that arguments at the fairness hearing expanded the cope of live Objections beyond the grounds stated in timely written Objections, or that any one Objector is a party to anyone else's Objection.

In *Amchem*, the proposed settlement agreement was attacked on the ground that the class representatives and their counsel purported to represent the entire class in the settlement negotiations while there existed subgroups within the class that had conflicting interests. Some *Amchem* plaintiffs had already suffered injuries and others still had not incurred injuries, and the *Amchem* settlement provided for less favorable compensation for the future claimants; the class counsel purported to represent both groups of claimants. Although it rejected the settlement agreement, the *Amchem* court suggested in dicta that Rule 23(a)(4) might be satisfied even where there are differences among subgroups of a class if there was some form of "structural assurance of fair and adequate representation for the diverse groups and individuals affected" by a settlement agreement. *Id.*, 521 U.S. 591, 117 S.Ct. at 2251. The Supreme Court favorably cited the Second Circuit's discussion of this issue: "But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups." *Id.* (citing *In re Joint Eastern and Southern Dist. Asbestos Litigation*, 982 F.2d 721, 742–43 (2d Cir. 1992), modified on reh'g *sub nom. In re Findley*, 993 F.2d 7 (2d Cir.1993)).

In a post-*Amchem* securities action, the objectors to a settlement agreement argued that inherent conflicts among investors in different entities prevented the named plaintiffs and their attorneys from adequately representing both subgroups of "Pegasus investors," contending primarily that the Pegasus plaintiffs' recovery under the settlement did not adequately reflect the strength of their claims on the merits. In discussing such a potential conflict, the court stated:

> This position is no more persuasive now than it was one year ago. Potential conflict between class members is often a danger in large class actions, but those conflicts are best resolved through "the normal pull and tug" of factions within the class itself. The Court's role in this process is not to substitute its own judgment for that of Class Counsel, but rather to insure that the interests of all class members are fairly and impartially represented throughout the negotiation of the settlement and allocation plan. In this action, the assignment of separate law firms and independent experts to represent each Partnership group was a reasonable and adequate means of protecting the interests of all Class Members; the [objectors'] contention that their recovery should be greater is an insufficient basis on which to conclude that those safeguards failed or were corrupted in any way. Accordingly, the Rule 23(a)(4) requirement of adequate representation is satisfied.

*In re Painewebber Limited Partnerships Litigation*, 171 F.R.D. 104, 123–24 (S.D.N.Y. 1997).

## (B) Objectors' Allegations of Conflict

As explained at the outset, the Global Settlement purports to fairly allocate the settlement funds to certain subgroups in the class: (1) sour barrels receive payment at a rate of 3.5:1 over sweet barrels; (2) late barrels receive approximately 90% of the fund, while early barrels receive just 10%; and (3) First Tier Royalties receive 70% of the fund while Second Tier Claimants receive 30% (and, consequently, First Tier Royalties are compensated for 53% of their estimated damages while Second Tier Claimants receive only 3 to 13% of their estimated damages). The first allocative decision has not been challenged and is supported by empirical data and expert testimony; thus, there does not appear to be an unresolved conflict of interest between sweet and sour owners. However, the other two allocative decisions have been challenged, and therefore the Court must scrutinize them and the process by which the funds were allocated.

First, the allocation of 90% of the funds to late [31] barrels and 10% to early barrels reflects the collective judgment of counsel that it would be extremely difficult to toll the statute of limitations as to their

---

**31.** Again, "late" barrels are those barrels produced after March 1992 (i.e., the date four years prior to the filing of *McMahon*).

various claims—Antitrust and Lease Claims alike. All of the MDL–1206 settlements, except Mobil which is in a unique case, apply such a discount to early barrels. Several facts were presented to the Court indicating that the tolling argument would be difficult to make and that, consequently, counsel's judgment in discounting early barrels was sound, at least at this stage in the litigation: (1) in 1992, Phillips publicly announced that the gap between postings and NYMEX was too wide; (2) after 1992, major companies' posted prices diverged, at various distinct levels from NYMEX, prompting the concern, according to plaintiffs, that not every posting equaled market value; and, (3) in 1993, Atlantic Richfield made royalty payments retroactive to 1986, to compensate for its prior below-market payments. In his January 1999 order in a *qui tam* posted price suit, Judge John Hannah of the Eastern District of Texas listed many instances where public allegations were made that posted price were below market price, and many of these instances pre-date April 1992. (*See United States of America ex rel. Johnson v. Shell Oil Co.*, 33 F.Supp.2d 528 (E.D.Tex.1999)). Finally, there is little potential for an actual conflict of interest between the owners of early barrels and owners of late barrels since any given class member is most likely an owner of both early and late barrels.[32] Thus, the Court FINDS that the settlements' 90:10 allocation of funds between late and early barrels does not represent a conflict of interest which would render the representation of the class inadequate.

Second, the Objectors' most serious objection is that the allocation of the settlement funds between First Tier Royalties and Second Tier Claimants[33] (viz., 70% to 30%) reflects the fact that class counsel inadequately represented the rights of Second Tier Claimants. Ordinarily, it could be expected that a conflict of interest objection would argue that the settlement class contains two subgroups which have received the same treatment under the settlement despite their differences. Here, the Objectors turn this commonplace argument on its head.

They contend basically that: (1) Similarly-situated class members must receive similar treatment in order for representation to be considered adequate; (2) under division orders and joint operating agreements with Defendants, Second Tier Claimants have claims for the breach of an implied duty which are every bit as strong as the First Tier Royalties' Lease Claims, so Second Tier Claimants and First Tier Royalties are in fact similarly-situated; and (3) therefore, the Second Tier Claimants are entitled to the same compensation as First Tier Royalties. Objectors argue that Second Tier Claimants have not received equal compensation because the representation of their concerns was allegedly inadequate.

The critical element in this argument is the second premise which takes the form of a statement of fact: namely, that the subgroups receive different compensation although the strength of their claims is substantially the same. In order to evaluate this assertion, the Court would have to evaluate the strength of both the Lease Claims and the claims based on division orders and joint operating agreements (the "JOA Claims"), but, at this stage, it would not be appropriate for the Court to make an indepth and conclusive determination in that regard. In the context of a discussion of class certification, the Supreme Court has stated that "nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen*, 417 U.S. 156, 94 S.Ct. at 2152. Further, in the context of the approval of a settlement, the Fifth Circuit has given this guidance:

> The trial court should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Milstein v. Werner*, 57 F.R.D. 515, 524–25 (S.D.N.Y. 1972). In performing this balancing task,

---

32. Dr. Leitzinger testified that 85% of the early barrels belonging to persons with claims for late barrels as well.

33. As stated above, "Second Tier Claimants" include both Second Tier Royalties and Working Interest Owners.

the trial court is entitled to rely upon the judgment of experienced counsel for the parties. *Flinn v. FMC Corporation*, 528 F.2d 1169 (4th Cir.1975). Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel. *Id.* at 1173. *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977).

In light of this guidance, the Court—in determining if Rule 23(a)(4) is satisfied—will consider the evidence before it as to the relative strengths of the JOA and Lease Claims but will place more emphasis on its review of the nature of the negotiations and the presence of "structural assurance[s]" of adequate representation. *Amchem*, 521 U.S. 591, 117 S.Ct. at 2251.

To begin, there are strong indications that the negotiation process guaranteed the adequate representation of the interests of the Second Tier Claimants vis-a-vis the First Tier Royalties. In the first stage of the negotiations, experienced class counsel—mainly Godfrey and Kipple—negotiated with Defendants to recover the maximum compensation for injuries arising out of the alleged wrongdoing. There is no suggestion of a conflict at this stage of the negotiations because all subgroups had a unified interest in getting the largest aggregate settlement from the Defendants for their alleged underpayment on oil production. Godfrey and Kipple initially negotiated a lump sum settlement fund of $135.5 million to release the claims of both the First Tier Royalties and the Second Tier Claimants.

The second stage of negotiations is where the potential conflict arises. At this stage, the class counsel agreed to allocate 70% of the settlement fund to First–Tier Royalties (who all had Lease Claims and Antitrust Claims.) As explained by class counsel at both the preliminary and final fairness hearings, there was a structural assurance of adequate representation of the subgroups of First–Tier Royalties and Second–Tier Claimants: Kipple, who brought only Antitrust Claims to the bargaining table, was motivated to seek maximum recovery for the Sec-

ond–Tier Claimants (who lacked Lease Claims); meanwhile, Godfrey, who was the only one bringing Lease Claims to the table, was necessarily motivated to maximize recovery for the Lease Claims. True to this division of labor, each respective attorney filed a fee application which sought compensation solely from the portion of the Global Settlement which he negotiated for in the second stage of negotiations. That is, the Godfrey group of attorneys sought a percentage of the First Tier Royalties' recovery, while the Kipple group sought a percentage of the Second Tier Claimant's recovery. Thus, each group of attorneys was motivated to seek the maximum recovery for their de facto subclass during the negotiation of the allocation between First Tier Royalties and Second Tier Claimants, and any conflict of interest between the two subclasses was "resolved through the normal pull and tug of the factions within the class itself." *In re Painewebber*, 171 F.R.D. at 123–24. That is, as in *In re Painewebber*, the fact that separate attorneys negotiated on behalf of subclasses with distinct legal claims reasonably and adequately protected the interests of the class.[34]

The Objectors complain that there is an area of overlap between the set of class members represented by Godfrey and those represented by Kipple (i.e., both attorneys represented class members who had Antitrust Claims) and therefore they were not suited to negotiate the allocation on behalf of the respective subgroups. Given the actual allocation at which Godfrey and Kipple arrived, this arguments holds no weight. If the allocation formula had treated all claims the same (effectively discounting the stronger Lease Claims), it might be argued that Godfrey and Kipple had not vigorously represented the differing interests of their respective subgroups. Significantly, this is precisely what did *not* happen. Different counsel represented different interests, negotiated on behalf of those interests, agreed to an allocation responsive to the relative strength of those interests, and sought to

---

34. Moreover, all the evidence available indicates that Godfrey and Kipple negotiated the allocation between First Tier Royalties and Second Tier Claimants vigorously. They both stated in open court that their negotiations were contentious, and, due to the fact that both are experienced class action litigators, neither was likely to take advantage of the other.

recover attorneys' fees based on their recovery for those distinct legal interests.

In sum, the Godfrey/Kipple negotiation over the allocation of the settlement funds served as a structural assurance that all valid legal claims attributable to the Second Tier Claimants were "sold" for their best value since the Kipple group of attorneys were interested in gaining the best recovery on their behalf. The structure of negotiations supports the presumption that, if the Second Tier Claimants had valuable JOA Claims, they would have been compensated in the Godfrey/Kipple negotiations. This assurance is, by itself, strong evidence that the potential conflict of interest was avoided.

There is yet another structural assurance, however, because, even after the Godfrey/Kipple negotiations, there occurred another round of negotiations on behalf of the Second Tier Claimants by a separate group of attorneys. When Godfrey and Kipple presented the Global Settlement for preliminary approval at the October 1998 hearing, the settlement provided for the allocation of 82% of the $135.5 million fund to First Tier Royalties and 18% to Second Tier Claimants. At that hearing, the Nonsettling Plaintiffs, led by Spencer Hosie, objected to the settlement, primarily on the grounds that not enough compensation was made to the Second Tier Claimants. After the Court granted preliminary approval to the $135.5 million Global Settlement, the Hosie group endeavored to negotiate a better deal for the Second Tier Claimants. According to Hosie, he considered the validity of JOA Claims but determined that the Antitrust Claim was the subgroup's best ground for negotiating a better settlement.[35] And, the Hosie group did manage to negotiate a significant improvement to the Global Settlement on behalf of the Second Tier Claimants, nearly doubling that subgroup's recovery (i.e., from $25 million to

$48 million) and rendering it 30% of the total recovery as opposed to 18% under the original Global Settlement. This second round of negotiations represents another layer of structural assurances which indicate that the Second Tier Claimants' legal interests were vigorously represented and that the value of any JOA Claim was not disregarded.

The history of posted price litigation itself indicates that it is misguided for the Objectors to assert that JOA Claims have been undervalued in these settlements. This litigation has been going on for four years now, and no attorney has been actively pursuing JOA Claims, even during the "feeding frenzy" of attorneys described by Professor John Coffee of Columbia University.[36] Indeed, the only cases cited by the Objectors in support of their JOA theory are cases involving the production of natural gas, rather than oil. See, Atlantic Richfield Co. v. Long Trusts, 860 S.W.2d 439 (Tex.App.—Texarkana 1993 writ denied); Johnston v. American Cometra, Inc., 837 S.W.2d 711 (Tex. App.—Austin 1992 writ denied). Moreover, counsel for Global Settling Defendants estimated that, even if a crude oil JOA Claim were legally feasible (which he believed was not the case), only a small percentage of the Working Interest Owners would be in a position to assert such a claim.

Thus, the Objectors' assertion that the Second Tier Claimants' JOA Claims have been improperly discounted by class counsel appears to be groundless. Two teams of lawyers—the Kipple group and the Hosie group—negotiated at two different stages for the allocation of funds to the Second Tier Claimants, and both of these attorney groups had interests in alignment with the subgroup on whose behalf they negotiated.[37] Further, the history of the litigation and case law both indicate that the JOA claim suggested by the

---

**35.** In fact, at the October 1998 preliminary fairness hearing, there was a brief discussion of the possibility of JOA Claims on behalf of Second Tier Claimants, and therefore it is unquestionable that Hosie had reason to consider the value of such claims as bargaining chips in the ensuing negotiations.

**36.** At the fairness hearing, there was no showing that any Second Tier Claimant actually had a claim for underpayment based on a JOA. Several

counsel advised the Court that they had considered but rejected such a claim. Moreover, the attorney who alleged such a claim, in 1997 in State of Texas, et al. v. Amerada Hess Corp., et al., fully supported the settlements.

**37.** The Hosie group sought fees from the $23 million increase in the Global Settlement which the Second Tier Claimants gained after the October 1998 preliminary fairness hearing.

Objectors was not of much value, even if it might someday prove viable as a legal matter.

Objectors raise another objection which is similar to the one just addressed. Some attorneys in the group comprising settlement class counsel have filed suits on behalf of only First Tier Royalties, and some have filed on behalf of both First Tier Royalties and Second Tier Claimants at once; however, none of the settlement class counsel have filed a complaint in any forum on behalf solely of Second Tier Claimants. Based on this fact, the Objectors complain that none of the settlement class counsel could have adequately represented the interests of the Second Tier Claimants since none were devoted exclusively to gaining a recovery for those claimants. That is, they object that all settlement class counsel who purport to represent the interests of the Second Tier Claimants have an inexcusable conflict of interest because they have signed pleadings on behalf of a putative class including First Tier Royalties.

This objection must fail for reasons which are evident in light of the Court's discussion of the JOA Claims. During the history of posted price litigation, no attorney in any jurisdiction endeavored to represent a class comprised of only the Second Tier Claimants (just as no one filed a class action suit to recover only under JOA Claim theories). This simple fact shows how fanciful the objection is. Since no attorneys filed a lawsuit on behalf of a putative class of only Second Tier Claimants, it is quixotic to demand that such an attorney be present in the process of litigating and settling the posted price claims. As a practical matter, the Second Tier Claimants have received the best representation possible because several attorneys (representing a putative class including Second Tier Claimants) had a personal incentive to gain the highest recovery for them during the negotiation of the allocation of the settlement funds between them and First Tier Royalties. Moreover, the Kipple and Hosie groups of attorneys did not in fact have a conflict of interest between the subgroups because those groups of attorneys exclusively represented the Second Tier Claimants' interests during the negotiation of the allocation. This process unquestionably satisfies *Amchem's* concern that subgroups be bound only by "consents given by those who understand that their role is to represent solely the members of their respective subgroups." *Amchem*, 521 U.S. 591, 117 S.Ct. at 2251. Notably, *Amchem* does not say that a subgroup must be represented in a settlement by an attorney who has filed a complaint solely on behalf of that subgroup.

In sum, there are no conflicts of interest between subgroups in the class which class counsel have not adequately managed.[38] The Court FINDS that Rule 23(a)(4) has been satisfied.

### 3. Rule 23(b) Requirements

Plaintiffs request the Court to certify a settlement class pursuant to Rule 23(b)(3). That rule imposes two prerequisites for class certification: (1) common questions of law or fact must predominate over questions affecting only individual members, and, (2) class

---

**38.** At the preliminary fairness hearing, it was objected that the Antitrust Claims were improperly discounted. This argument fails for many of the same reasons that the Objectors' JOA argument fails. Additionally, there are several reasons why the Antitrust Claims appear to be relatively weak. First, the Antitrust Claims may be weaker because of the sheer difficulty of collecting and analyzing the data to prove an antitrust conspiracy. In comparison, proving the Lease Claims, although difficult, is less complicated since it does not require proof of a conspiracy. Second—through Dr. James Sweeney, a highly-credentialed Stanford economist—Global Settling Defendants presented evidence that the structure of the oil industry makes it unlikely that a conspiracy could exist to depress the price paid for oil at the lease. Third, there was expert testimony indicating that more Second Tier Claimants received bonuses on their payments from Defendants than did First Tier Claimants; for that reason, it follows that the Second Tier Claimants' damages were less and deserve less compensation. Fourth, with respect to the working interest owners, a class action on their behalf will necessarily be more difficult to manage since it is necessary to determine which working interest owners were potentially co-conspirators and which have bona fide antitrust claims. Finally, it is telling that the Department of Justice has not brought antitrust claims against the oil industry on the posted price theory; likewise, it is significant that Godfrey—whose firm had extensive experience in antitrust class actions—chose to file his suit based solely on Lease Claims.

action must be a superior form of adjudicating the claims. Fed.R.Civ.P. 23(b)(3).[39]

### a. Common Questions of Law or Fact Predominate

■ "[T]here are no hard and fast rules which have developed regarding the suitability of a particular type of antitrust case for class action treatment. The unique facts of each case will generally be the determining factor governing certification." *State of Alabama v. Blue Bird Body Company*, 573 F.2d 309, 316 (5th Cir.1978) "[T]he predominance test really involves an attempt to achieve a balance between the value of allowing individual actions to be instituted so that each person can protect his own interests and the economy that can be 'achieved by allowing a multiple party dispute to be resolved on a class action basis.'" 7A Wright, Miller & Kane, Federal Practice and Procedure, § 1777 at 518–19 (1986).

■ The entire class shares in several questions of fact, as well as certain questions of law. Indeed, the two central questions of fact that need to be determined in order to bring a posted price claim of any sort are common to all class members: What was the fair market value of oil at the lease? How did Defendants arrive at their posted prices? The legal questions relate to the common task of showing that the Defendants arrived at their posted prices in a manner which ensured that they were below the fair market value of oil at the lease. Under the antitrust theory (as to which all class members have a claim), it must be shown that the Defendants engaged in a price-fixing conspiracy. The *Amchem* court has recently reiterated that "predominance [of common issues] is a test readily met in certain cases involving consumer or securities fraud or violations of antitrust laws." *Amchem*, 521 U.S. 591, 117 S.Ct. at 2250; *see also* 4 Newberg § 18.28 at

18–98–99 ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions"). "Several courts have held that when a defendant is alleged to have participated in a nationwide price-fixing conspiracy, impact will [be] presumed as a matter of law, and the predominance requirement of Fed. R.Civ.P. 23(b)(3) will be satisfied." *Lumco Industries, Inc. v. Jeld–Wen, Inc.*, 171 F.R.D. 168, 173 (E.D.Pa.1997)(citing *In re Citric Acid Antitrust Litig.*, 1996–2 CCH Trade Cases P 71,595, 1996 WL 655791 (N.D.Cal. Oct. 2, 1996)). Thus, this commonality of questions of fact and law appears to satisfy the predominance requirement.

In sum, the Court FINDS that, since the proposed settlement class members share an interest in proving many of the same facts and legal elements, the predominance requirement for a subsection (b)(3) class appears to be satisfied.

### b. Superiority of Class Action

■ "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential*, 148 F.3d at 316. For a class certification, Rule 23(b)(3) lists four factors: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b)(3). However, *Amchem* states that, "[c]onfronted with a request for settlement-only class certifica-

---

**39.** Rule 23 provides:

(b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

&ast; &ast; &ast; &ast; &ast; &ast;

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

tion, a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial." *Amchem,* 521 U.S. 591, 117 S.Ct. at 2248 (citation omitted).

■ The remaining three superiority factors (A, B and C) indicate that the class action is the best vehicle for conducting this litigation. Since the cost of complex commercial litigation against one or more oil companies is extremely high and the individual returns comparatively low, the class action appears to be the only feasible manner of bringing posted price claims. The plaintiffs involved in the instant litigation form a group which is eminently suited for class treatment: "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem,* 521 U.S. 591, 117 S.Ct. at 2246.

Furthermore, the lawsuits underlying this multidistrict litigation are well-developed cases and appear to be the appropriate channel for this class to be certified. Prior to their arrival in this Court, many of the settling cases had either gone through or arrived at the verge of having class certification hearings in state court. Also, the attorneys in these cases have discovered millions of pages of documents and have completed over one hundred depositions. Finally, as the JPML's transfer orders have indicated, it is desirable that suits for recovery on this posted price theory be handled together and in this Texas forum where more than half of the oil in the continental United States is produced. Accordingly, the Court FINDS that the proposed settlement class appears to meet the superiority requirement.

## D. Rule 23(c)(2): Notice Requirement

■ Rule 23(c)(2) requires that, for class actions certified under subsection (b)(3), "the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2). The type of notice to which a member of a class is entitled "depends upon the information available to the parties about that per-

son" and the possible methods of identification. *In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1098 (5th Cir.1977), *explaining Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *see also In re Domestic Air Transp. Antitrust Litig.,* 141 F.R.D. 534, 539 (N.D.Ga.1992). Where a potential class member's address is known or is available through reasonable efforts, individual or actual notice is required; constructive notice by publication in that circumstance would not satisfy the requirements of Rule 23(c)(2). *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *In re Nissan,* 552 F.2d at 1099. In determining the reasonableness of the effort required, the court must look to the "anticipated results, costs, and amount involved." *In re Nissan,* 552 F.2d at 1099.

Here, actual notice of the eight settlements via first class mail was attempted to all class members who have received payments from Defendants since 1986. Also, publication notice was made in the Wall Street Journal and USA Today. The notice itself provided far more information than the sample forms in the Manual for Complex Litigation, Third, § 41.42. Professor Samuel Issacharoff of the University of Texas opined that, despite the complexity of the settlement, the notice was a model of clarity.

■ There were a few objections that the notice was deficient because it did not report the per-barrel recovery that 'Second Tier Claimants would receive under the settlements. However, an accurate estimate of the Second Tier Claimants' per-barrel recovery could not be reported since that recovery depended on how many Second Tier Claimants (1) could affirm that they had not entered related buy/sell agreements with the Defendants, and (2) decided to submit a claim form (at least as the process was initially designed.) Instead of an unreliable estimate, the class was provided with an explanation of the formula by which the settlement funds would be allocated. Notice is adequate where the class member is notified of the formula of allocation. *See e.g. Seiden v. Nicholson,* 72 F.R.D. 201, 205 (N.D.Ill. 1976); 2 Newberg § 8.32 at 8–107 ("It is

**430**

unnecessary for the settlement distribution formula to specify precisely the amount that each individual class member may expect to recover. It should be recognized that the ultimate recovery may often depend on the number of valid claims filed"). Accordingly, the Court FINDS that the notice to the class of the eight settlements satisfied Rule 23(c)(2) and constitutional due process.

### E. Rule 23(d): Claim Form Procedure

■ Rule 23(d), which permits the court to make appropriate orders to facilitate the orderly progression of the class action, governs the claim form process. Fed.R.Civ.P. 23(d); 2 Newberg § 8.32 at 107. The claim process is commonly used in antitrust settlements. *See e.g., In re Armored Car Antitrust Litig.,* 645 F.2d 488 (5th Cir.1981); *In re Chicken Antitrust Litig.,* 669 F.2d 228, 238 (5th Cir.1982); *In re Antibiotic Antitrust Actions,* 410 F.Supp. 706 (D.Minn.1975).

In October 1998, at the preliminary fairness hearing, the Court determined that it was proper to require certain Second Tier Claimants who had claims in excess of 5500 barrels[40] to file claim forms (including a "Table of Information" reporting the number, type and price of barrels sold) in order to participate in the Global Settlement. This determination was made based on the desire to make the allocation of settlement funds fair and also based on the availability of data at the time. First, as noted above, many Working Interest Owners received bonuses above posted prices when paid for their oil production. In order to exclude the recipients of large bonuses from the settlement, class counsel designed the so-called "threshold criteria" which would identify those recipients and enable their exclusion. Basically, the threshold criteria operated on the assumption that if the price received by the Working Interest Owner was within 45 cents of the price of the oil at the trading center, then the Working Interest Owner suffered no damages and those barrels should be ex-

cluded.[41] In order to implement the threshold criteria, it was necessary for the Working Interest Owners to report the actual price they received for the oil produced. Second, class counsel believed the claim form process was necessary in order to provide the barrel information on large claims. Third, the Second Tier Claimant was required to submit a claim form in order to affirm that he or she had not engaged in any related buy/sell or exchange agreements based on posted prices with the Defendants, an affirmation indicating that there could be no suspicion of participation in the alleged conspiracy.[42]

As the claim form process unfolded, two facts became evident: the Defendants were more capable of providing Second Tier Claimants' barrels than had been expected, and the burden of completing a claim form was so onerous to the Second Tier Claimants that it could not be justified by the need to exclude recipients of large bonuses. Thus, at class counsel's request, the Court modified the claim requirements. Although Second Tier Claimants still had to file an affirmation that they did not engage in related buy/sell and exchange agreements, the Court, through Orders Nos. 60, 65 and 68, removed altogether the requirement that Second Tier Claimants submit a Table of Information reporting the number, type and price of barrels sold in the relevant period. Instead, Second Tier Claimants were allowed to choose to rely on the data provided by the Defendants. The Court granted this option in two stages. First, in February, the approximately 15,000 Second–Tier Royalty owners with claims in excess of 5500 barrels were given the opportunity to choose to rely on the Defendants' data. Then, at the final fairness hearing in April, the Court effectively extended to all Working Interest Owners who had not opted out (including those with more than 5500 barrels) the option to rely on the Defendants' volume data: it extended their deadline for filing a claim until June 15, 1999—i.e., over

---

**40.** Over 90% of Second Tier Claimants had claims for less than 5500 barrels.

**41.** As explained in the Claim Form: "The 'Threshold Criteria' are satisfied for Sweet barrels in a given month, if the average per-barrel payment was less than NYMEX minus 45 cents. For Sour barrels in a given month, the Threshold

Criteria are satisfied if the average per-barrel payment was less than NYMEX minus both 45 cents and the Platt's WTI/WTS differential." (Claim Form at 2).

**42.** This mechanism was designed to exclude from the settlement class all entities which were potentially co-conspirators with the Defendants.

two months after the order issuing notice of this extension.

In the end, the original claim form process proved to be more burdensome and unwieldy than it was worth to the class members. However, the class was prejudiced only insofar as the effort entailed the expenditure of settlement funds on administrative costs that otherwise would not have been incurred. Ultimately, in terms of due process rights and fundamental fairness, the rights of all Second Tier Claimants received optimal protection since they were required, in order to participate in the settlement, only to affirm that they had not engaged in activities which could give rise to allegations of engaging in a conspiracy with the Defendants. Such a requirement was necessary to properly define the class of Second Tier Claimants and did not impose an undue burden. The Court FINDS that the claim process satisfies Rule 23 and due process.

**F. Rule 23(e): Fairness of Settlement Agreements**

 Rule 23(e) provides for the settlement of class action suits:

> A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs.

Fed.R.Civ.P. 23(e). Rule 23(e) provides no standard by which a court is to consider the settlement of a class action. *In re Corrugated*, 643 F.2d at 207. "In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable." *Id.* (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977)). The Fifth Circuit has identified six factors which the district court must examine in determining whether a proposed settlement meets this goal: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; (6) the opinions of the class counsel, class representatives, and absent class members. *Reed v.*

*General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983).

While a district court must evaluate the settlement for its fairness, it "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Id.* "The very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise [i.e., behind the creation of Rule 23(e)]. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty." *Corrugated*, 643 F.2d at 212.

 The Court has been presented with eight settlement agreements which largely overlap in terms of their structure and provisions. In fact, several of the Stand Alone Settlements take the Global Settlement's consideration as a benchmark, with the Settling Defendants pledging parity with the Global Settlement. Thus, four of the six *Reed* factors apply equally to all eight settlements; only the fourth and fifth *Reed* factors—namely, the likelihood of success on the merits and the range of possible recovery against the settling defendant(s)—will require separate treatment for the distinct settlements. The Court will discuss the four overlapping *Reed* factors first and then will discuss the adequacy of each settlement individually in light of the possible recovery against the respective Defendants.

**(a) Existence of Fraud or Collusion**

There have been no allegations that class counsel have engaged in fraud or collusion in negotiating these settlement agreements, and there is no evidence to support any such allegation.

**(b) Complexity and Expense of Litigation**

Here, "[t]he question is whether the likelihood of an especially long and complex trial is enough in a particular case to warrant a substantial reduction in what the class might otherwise receive in settlement." *In re Corrugated*, 643 F.2d at 217. Like virtually all

antitrust class action suits, MDL–1206, if litigated, promises to be a long, complex and expensive battle for the Plaintiffs. Since this litigation promises to be long and complex, it is reasonable to expect that the settlement value be discounted in comparison with non-class action and non-antitrust suits; however, there is no reason to believe that the settlement should be discounted in comparison with other complex class actions. When considering the adequacy of the recovery, the Court will compare the recovery with other suits of its kind.

### (c) Stage of Proceedings and Amount of Discovery

A settlement may be approved even where plaintiffs have not conducted formal discovery where plaintiffs did have access to "the desired quantum of information necessary to achieve a settlement." *In re Corrugated,* 643 F.2d at 211. However, "if the record points unmistakably toward the conclusion that the settlement was the product of uneducated guesswork, a court may be acting within its discretion in disapproving the agreement without ever considering whether the agreement's terms are adequate." *Id.* If it appears that counsel "was relying on judgment bolstered by only a small amount of information, the district court should be especially thorough in its review of the fairness and adequacy of the settlement terms." *Id.*

There has been significant litigation and discovery in several actions consolidated in MDL–1206. Godfrey began investigating this litigation in 1993, first filed the Texas Suit almost four years ago, and entered global settlement negotiations when on the verge of beginning a class certification hearing. In preparation for that hearing, Godfrey conducted discovery on class certification issues—many of which overlap with the substantive issues in making Lease Claims. Godfrey's expert economist, Dr. Leitzinger, demonstrated to this Court that he had sufficient data to make a comprehensive and detailed report on the marketing practices in Texas.

In the *Engwall* suit in New Mexico, plaintiffs' counsel discovered hundreds of thousands of documents and performed dozens of depositions prior to a class certification hearing. The *Engwall* court held a week-long class certification hearing at which both plaintiffs and many of the defendant oil companies had the opportunity to test the strength of their evidence and experts in court.[43]

In *McMahon,* counsel for plaintiffs were forced to amend their initial complaint, and, subsequently, they successfully defended their amended complaint from motions to dismiss by various defendants. (*See* Orders Nos. 8 and 9.) *McMahon* counsel also briefed and argued the Full Faith & Credit issue against Mobil, ultimately prevailing. (*See* Order No. 21.) Further, MDL–1206 proceeded on a litigation track for approximately one year, during which time discovery continued against then-Nonsettling Defendants. At present, there are approximately 5 million documents in the MDL–1206 document depository, and it is estimated that there are several million more documents which counsel have made available for review.

Considering the detailed analysis of the experts, the apparent knowledgeability of class counsel, and the sheer mass of documents available to litigants, there is every indication that class counsel has had a sufficient understanding of the claims involved in this posted price litigation in order to negotiate an appropriate settlement.

### (d) Opinions of Counsel

In this case, there are certainly qualified class counsel who believe that the settlement is adequate. Again, the main proponents of the settlements—Godfrey, Kipple, Hosie and Etherton—have extensive experience in such matters. Further, other experienced counsel have decided to include their actions in the settlements (i.e., Mel Eaves in *Engwall,* Rayford Etherton in Alabama). Predictably enough, a few Class Members filed Objections. However, the number of opt-outs was relatively low: 0.4% of Class Members with First Tier Royalty claims and 0.2% of the Second Tier Claimants under the Global Settlement. Overall, this *Reed* factor certainly tilts in favor of approval of the settlements.

---

**43.** While the *Engwall* court initially denied class certification, it reconsidered this denial after learning of the *Lovelace*–Mobil settlement and then certified a class against Mobil.

### (e) Range of Possible Recovery and Probability of Success on the Merits

These two *Reed* factors are based on two general ground rules: "The settlement terms should be compared with the likely rewards the class would have received following a successful trial" and "the strength of the case for plaintiffs must be balanced against the amount offered in settlement." *In re Corrugated*, 643 F.2d at 212 (quotations removed). The Fifth Circuit has established a three-step process for making the appropriate analysis:

> First, the district court must evaluate the likelihood that plaintiffs would prevail at trial. Second, the district court must establish a range of possible recovery that plaintiffs would realize if they prevailed at trial. And third, guided by its findings on plaintiffs' likelihood of prevailing on the merits and such other factors as may be relevant, the district court must establish, in effect, the point on, or if appropriate, below, the range of possible recovery at which a settlement is fair and adequate.

*Id.*

For example, in *In re Corrugated*, the Fifth Circuit found that it was proper to discount a settlement because several characteristics of the industry would render a nationwide price-fixing conspiracy unlikely: the industry is fragmented, highly-competitive, and allows the entry of new businesses. *In re Corrugated*, 659 F.2d 1322, 1327 (5th Cir. 1981). Further, the court found that plaintiffs would have difficulty proving their case because evidence would be hard to obtain and because many of defendants' employees would invoke their Fifth Amendment privileges. *Id.*

As mentioned above, the Court will address the Global Settlement first and then turn to the Stand Alone Settlements.

#### i. Likelihood of Success at Trial

First, the Court must evaluate the likelihood of success at trial. Defendants have demonstrated that they can raise significant defenses to both the Antitrust and Lease Claims.

With respect to the Antitrust Claims, Defendants presented Dr. James Sweeny, a Stanford economist, who testified that (1) due to the structure of the oil marketing industry, Defendants could not successfully collude to increase the wholesale margin to an anti-competitive level because there are plenty of competitors who could enter the transportation business and capture that excess differential; and, (2) buy/sell agreements and overall balancing agreements are not feasible mechanisms for implementing a conspiracy to depress prices paid at the lease, because they have no effect on the supply and demand for crude oil. To date, the best that class counsel pursuing Antitrust Claims have managed with respect to those claims is to produce evidence showing (1) that wholesale differentials consistently exceeded the transportation costs and quality differentials (a fact which Plaintiffs' expert says is "consistent with" an antitrust conspiracy), and (2) some Defendants have at times engaged in related buy/sell and exchange agreements in a manner which suggests (to plaintiffs) that they did not believe that posted prices reflected the fair market value of oil at the lease. Every expert to opine on the issue stated the belief that the antitrust case would be a very difficult one to make.

Defendants also presented evidence, including the testimony of Professor Joseph Kalt, that the Lease Claims were not certain to succeed. Plaintiffs disputed Dr. Kalt's data and offered, in contrast, Dr. Leitzinger's trading center method. Based upon the record before the Court, Dr. Leitzinger's trading center method approach seems reasonable. Dr. Leitzinger concluded that posted prices historically appear to have fallen short of actual market value at the lease. This conclusion is the crux of the Lease Claims, and it is relatively much stronger than the evidence marshaled in support of the antitrust conspiracy theory. Nevertheless, presently, there is no reason to be too certain that class counsel would be successful in litigating the Lease Claims: many of the Defendants have already prevailed in the only class certification hearing to date on the issue, avoiding certification of a statewide class in the *Engwall* litigation.

Finally, as explained above in Section III. C.2(d)(ii)(B), there is significant evidence that the "early" barrels may be barred by the

statute of limitations because the alleged fact of underpayment was discoverable with due diligence by persons in the proposed settlement class. Thus, it is evident that Defendants can at least make a strong argument that the basis of the allegations was long discoverable and that, consequently, Plaintiffs could not successfully invoke the discovery rule or the doctrine of fraudulent concealment in order to escape the limitations bar.

In sum, the Defendants have presented substantial defenses to the Antitrust Claims and to fraudulent concealment. The Lease Claims seem much stronger than the Antitrust Claims, yet the course of the *Engwall* litigation demonstrates that many pitfalls remain between the First Tier Royalties and a favorable final judgment.[44]

### ii. Range of Possible Recovery

The range of possible recovery is fairly certain with respect to the First Tier Royalties, but has been more roughly estimated with respect to the Second Tier Claimants. By applying the NYMEX trading center method to calculate a fair market value for oil at the lease,[45] Dr. Leitzinger has been able to estimate the damages to First Tier Royalties from 1986 to 1998. Including interest, Dr. Leitzinger estimates that First Tier Royalty damages due to alleged underpayments by Global Defendants amount to $358.8 million. Under the Global Settlement, the First Tier Royalty owners recover $116.19 million[46] to compensate these damages. That is, First Tier Royalties receive 32% of their estimated damages under the Global Settlement.

Class counsel frequently discussed damages in terms of the estimated damages after discounting the damages to early barrels by 90% since those barrels were subject to the limitations defense. Given the apparent strength of that defense, it is reasonable to make such a discount for the early barrels, at least for the sake of comparison. Once a 90% discount is factored into the damage equation for early barrels, the First Tier Royalties subgroup will receive 53% of their estimated damages as a whole.

Although the Lease Claims (which belong only to First Tier Royalties) appear to be relatively strong, a recovery of 32% (or 53%) at this date appears to be quite a successful recovery, given the potential length of the litigation and the possibility that Defendants will prevail at one of the many stages (just as they prevailed at the class certification hearing in *Engwall*). It must be remembered that the Lease Claims asserted in this litigation have never before been successfully brought and that even the NYMEX trading center method of calculating fair market value of oil at the lease is disputed. Finally, compared with other complex commercial class action settlements, a recovery of over 32% (and certainly over 53%) is substantial. *See In re Domestic Air Transportation Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D.Ga. 1993)(about 14% recovery); *In re Catfish Antitrust Litig.*, 939 F.Supp. 493, 498 (N.D.Miss.1996)($27 million settlement for "damage calculations in the range of several hundreds of millions of dollars"); *In re Anthracite Coal Antitrust Litig.*, 79 F.R.D. 707, 714 (M.D.Pa.1978) ("approximately 28% of the maximum possible recovery"); Janet C. Alexander, *Do Merits Matter?: A Study of Settlements in Securities Class actions*, 43 Stan. L.Rev. 497 (1991)(discussing settlements in eight securities class actions involving initial public offerings of computer-related companies; average recovery was 21.7% of the damages alleged).[47] In light of the

---

**44.** These findings apply equally to all of the settlements. However, as explained below, the possibility of prevailing against certain Stand Alone Defendants is less than it is against the Global Defendants due to nature of the operations and postings of those Defendants.

**45.** This calculation took into account transportation costs and any differentials for gravity and quality of the oil.

**46.** This figure is the amount recovered prior to subtracting for first tier opt-out adjustments— i.e., for each first tier royalty barrel which opts-

out, the net recovery is reduced by the corresponding per barrel recovery.

**47.** Professor Issacharoff states, in his declaration, that "in securities class actions, most settlements recover from 4–12 cents on the dollar of estimated actual loss," citing Denise N. Martin et al., *Recent Trends IV; What Explains Filings and Settlements in Shareholder Class Actions?* (NERA 1996). Professor Coffee's declaration provides the following information:

At the time of the enactment of the Private Securities Reform Act of 1995, the Congress

uncertainties of recovery, the consideration to the First Tier Royalties for releasing their claims appears to be adequate.

With respect to the Second Tier Claimants, Dr. Donald House calculated the estimated damages using a NYMEX trading center method. He then reduced the estimated damages to account for the fact that more Second Tier Claimants than First Tier Royalties actually received bonuses above posted price for their oil during the relevant period and especially during the critical "late" period.[48] He estimated that Second Tier Claimants' early barrels were damaged by 32 cents per barrel while those late barrels were damaged by 49 cents per barrel. Assuming these figures are correct, the Second Tier Claimants would receive 3% of their estimated damages for early barrels and 13% of their estimated damages for late barrels.

Appropriately enough, these rates of recovery are less than those of the First Tier Royalties. The Second Tier Claimants rely primarily on their Antitrust Claims which, as explained above, face significant problems which the Court will not reiterate in full here. In short, whether or not some Defendants knew their posted prices did not reflect market value at the lease, that knowledge on its face would not prove that the Defendants engaged in a conspiracy to fix their prices below market prices. At most, it appears to the Court that even if Plaintiffs could show that Defendants' prices reflected conscious parallelism, more than that would be needed to establish a conspiracy. Given this outlook, it is remarkable that Plaintiffs could recover $48 million for the Second Tier Claimants under the Global Settlement, even if that sum represents just 3 to 13% of the estimated damages.

Accordingly, the Court FINDS that, in light of the relative probabilities of recovery, both the First Tier Royalty aspect and the Second Tier Claimant aspect of the Global Settlement are fair, adequate and reasonable.

### iii. Exxon Settlement

Under the Exxon Settlement, Exxon will pay the same MDL–1206 settlement class $10 million to release the same set of posted price claims as released under the Global Settlement. Exxon's circumstances are special in just one notable regard: since 1992, its posted prices have been nearly equal to the price for oil at the lease using a trading center method. Since Exxon's posted prices

had before it a variety of studies of securities class actions that showed that the median securities class action resulted in a payment to class members equal to about 5% of their losses. See "Private Litigation Under the Federal Securities Laws: Hearings Before the Subcommittee on Securities of the Senate Committee on Banking, Housing and Urban Affairs," 103rd Congress, 1st Sess. (June 17 and July 21, 1993) at p. 739.

See also Senate Rpt. 104–98, "Private Securities Litigation Reform Act of 1995" (June 19, 1995)(available on Lexis–Nexis, library LEGIS, file CMTRPT)(discussing securities class actions; "Numerous studies show that investors recover only 7 to 14 cents for every dollar lost as a result of securities fraud").

48. This second estimate was provided by Mr. Jules Videau, a consultant and former oil trader, who reviewed purchase agreements in order to arrive at a reasonable estimate of the frequency and size of such bonuses.

One Class Member, Corman, complained at the fairness hearing—but not in his timely written Objection—that the Global Settlement's plan of allocation does not give favored treatment to class members who did not receive bonuses and whose damages were, accordingly, greater than the overall average.

The evidence shows that, to the extent it was practicable, the settlement actually does differentiate on the basis of whether or not they received bonuses; i.e., it compensates the First Tier Royalties at a higher per barrel rate than he Second Tier Claimants partly for the reason that, as Mr. Videau explained, the latter more frequently received bonuses than the former. It appears that the differentiation made under the settlement is the greatest degree of individualization of damages that is cost-effective.

As explained in more detail below in the discussion of notice and the claim form process, class counsel initially attempted to distinguish between those Second Tier Claimants who received high bonuses and those who did not. The claim process initially required certain class members to report their payments and excluded those whose payment was close to the NYMEX-related price for oil at the lease. This process for creating a "threshold" turned out to be too burdensome on the class members themselves and had to be dropped completely. The effect of this modification was too dilute the average per-barrel recovery for Second Tier Claimants since even class members who received large bonuses would be allowed to participate; but as a practical matter it was necessary to do so in order to enable Second Tier Claimants to participate at all.

were so near to the market prices, it would be even more difficult to prove that Exxon engaged in a conspiracy to depress posted prices than to show that "low posters" did so. That is, based on this evidence, it appears that, even if there was a conspiracy, Exxon was left out of it.

Accordingly, it is reasonable to allocate a greater percentage of Exxon's settlement fund to the First Tier Royalties. That subgroup receives 82% of the fund which compensates them for 37% of the total "raw" estimated damages (as compared to the 32% of the damages received by their Global Settlement counterparts.) If the early barrel damages are discounted for the limitations period, the Exxon First Tier Royalties recover a total of 76% of their estimated damages. Clearly, this aspect of the Exxon Settlement is adequate for the same reasons that the Global Settlement is adequate.

Exxon also pays a higher per-barrel amount to its Second Tier Claimants than the Global Settling Defendants pay. While the Global Second Tier Claimants receive 0.9 cents and 6.4 cents per barrel in the early and late periods respectively, the Exxon Second Tier Claimants receive 1 cent and 21 cents per barrel respectively. Given that the Antitrust Claims are even weaker against Exxon than against most of the Global Defendants, there can be no question that this recovery is adequate. The Court FINDS that the Exxon Settlement is fair, adequate and reasonable.

### iv. Fina Settlement

Under the Fina Settlement, Fina pays $5 million to settle the same posted price claims with the same MDL–1206 class. The settlement fund is allocated in the same percentage to the First Tier Royalties and the Second Tier Claimants as in the Global Settlement (i.e., 70:30.) The Fina First Tier Royalties recover the same percentage of their estimated damages as the Global First Tier Royalties (53%, after discounting the early period). Also, the Fina Second Tier Claimants gain a much higher cents/barrel recovery than do their Global counterparts (3 cents for early barrels and 14.5 cents for late barrels). Accordingly, the Court

FINDS that the Fina Settlement is fair, adequate and reasonable.

### v. Atlantic Richfield Settlement

As mentioned, Atlantic Richfield voluntarily paid almost $20 million to its royalty owners in 1993 in order to compensate for underpayments since 1986. Also, at that time, it adopted a net-back method for ensuring that its future royalty payments were based on a market price. Consequently, Atlantic Richfield does not appear to have any liability to First Tier Royalties or to Second Tier royalties, and its entire $600,000 settlement payment is to go to Working Interest Owners. According to Dr. House's calculations, Atlantic Richfield's payments to Working Interests will render them a recovery of 22.5 cents per barrel in the relevant period [49] (as compared to 6.3 cents in the Global Settlement.) Accordingly, the Court FINDS that the Atlantic Richfield Settlement is fair, adequate and reasonable.

### vi. Apache Settlement

Unlike many defendants, Apache is a producer of oil which almost exclusively sells (rather than buys) oil at the lease to third parties. It pays its royalty and working interest owners based upon its sale proceeds, and so was not in the position to underpay many class members. However, during the mid–1990s, Apache did create one subsidiary to market oil that it produced in Wyoming.

Under the Apache Settlement, Apache pays $350,000 to settle the same underpayment claims with the same MDL–1206 class. The First Tier Royalties receive $245,000, which compensates them at a higher rate than the Global First Tier Royalties (61% after discounting for the limitations period, as compared to 53%.) And, the Apache Second Tier Claimants are allocated $105,000, which also compensates them at a higher rate than their Global counterparts (viz., 0.92 cents for each early barrel and 14.4 cents for each late barrel.) The Court FINDS that the Apache Settlement is fair, adequate and reasonable.

49. Atlantic Richfield's only working interest bar- rels fall in the late period.

### vii. Phibro/Basis Settlement

Phibro is a commodity trader that has never made payments to class members, and so it has no liability. Before spinning off its crude oil gathering unit in 1996, Basis was a transporter of oil that never made payments to First Tier Royalties.

Under the Phibro/Basis Settlement, Basis makes a payment of $350,000 from its residual litigation fund to the same MDL–1206 class in order to release the same underpayment claims. All of its $350,000 goes to Working Interest Owners, yet its payment does not match the cents/barrel recovered by the Global Second Tier Claimants; rather, Phibro's per barrel payment is only about 2/3 the payment under the Global Settlement. Nevertheless, when considering the adequacy of a class action settlement, it is proper to consider the defendant's ability to pay. *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1328 (5th Cir.1981). In light of this fact, the Court FINDS that the Phibro/Basis Settlement is fair, adequate and reasonable.

### viii. Koch Settlement

Under the terms of the Koch Settlement, Koch pays $11.025 million to the same MDL–1206 settlement class to release the same set of posted prices claims. Since Koch is engaged almost exclusively in the business of gathering and transporting crude oil, it has lease relationships with very few First Tier Royalties. Thus, the Koch settlement fund is allocated by: (1) determining the number of First Tier Royalty barrels, (2) reserving the amount of money needed to compensate those First Tier Royalty barrels at the same rate that the Global Settlement provides, and (3) using the remainder to compensate Second Tier Claimants.

This allocation formula results in Koch paying about $450,000 to First Tier Royalties, meeting parity with the Global Settlement by compensating 53% of the estimated damages (after discounting for the limitations period). The remaining $10,575,000 is split 10/90 between the early Second Tier Claimant barrels and the late barrels, rendering a

payment of 0.6 cents per early barrel and 8.2 cents per late barrel. In terms of parity with the Global Settlement, this recovery by Second Tier Claimants both exceeds and falls short of parity: the early barrels recover less (0.6 cents compared to 0.9 cents per barrel), while the late barrels recover more (8.2 cents compared to 6.4 cents per barrel.)

There are several reasons to find this rate of compensation adequate even though it does not meet the Global Settlement in terms of parity in every respect. First, Koch's aggregate payment to the Second Tier Royalties in fact exceeds the aggregate payment necessary to make parity with the Global Settlement, but, because of the relatively high number of early volumes, it falls short in the early period. That is, if Koch's funds were distributed differently between the early and late periods, it would only require a payment of about $9 million to make parity, whereas Koch actually pays $10.575 million under its settlement. Second, compared to those in the Global Settlement, a higher percentage of Koch's Second Tier Claimants were excused from filing a sworn statement regarding related buy/sell and exchange agreements.[50] A larger percentage of Koch barrels are therefore eligible for payment. Third, Koch has a plausible argument that, due to its role in the oil industry, it in fact fomented competition for oil at the lease, rather than restricted it, and therefore the Antitrust Claims are less viable against it in any case. In light of these facts, The Court FINDS that the Koch Settlement is fair, adequate and reasonable.

### ix. Mobil Settlement

In order to release the same posted price claims from the same MDL–1206 class, Mobil, one of the largest integrated oil companies operating in the United States, is to pay just $2 million. As mentioned at the outset, the Mobil Settlement presents unique circumstances which explain the relatively small payment which it offers to make to the class at this time.

---

50. This was due to the fact that only those Second Tier Claimants with more than 5500 Koch barrels were required to file claim forms; this 5500 barrel threshold was the same amount used in the Global Settlement, under which the Second Tier Claimant may use barrels relating to transactions with 24 Defendants.

438

Mobil already has entered two settlements which provide substantial benefits to the class. In 1997, an Alabama state court in *Lovelace v. Amerada Hess et al.* approved a settlement agreement whereby Mobil would pay $15 million to a nationwide class of royalty and working interest owners to release all state and federal underpayment claims against it. In its plan of allocation, the *Lovelace* settlement did not distinguish between early and late barrels or between entities with Lease Claims and those without such claims.

Of course, since the *Lovelace* class coincides with the MDL–1206 settlement class, Mobil attempted in this Court to assert that the *Lovelace* settlement warranted full faith and credit in federal court under *Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). However, in Order No. 21, this Court ruled that, since Alabama law would not give the *Lovelace* settlement preclusive effect over federal antitrust claims, the settlement was not entitled to full faith and credit. Mobil's appeal of Order No. 21 remains pending. Meanwhile, in 1998, Mobil entered a second settlement—this one with Godfrey in Texas state court, paying about $6.2 million to release the underpayment claims of Mobil's Texas royalty payees. Finally, Mobil has also agreed to enter a settlement in New Mexico state court in the *Engwall* suit, paying about $1.5 million to release the underpayment claims of Mobil's New Mexico royalty payees. This New Mexico settlement is still pending approval by the trial court. Notably, Texas and New Mexico royalty barrels combined comprise about 70% of Mobil's total royalty barrels in the continental United States.

Assuming the New Mexico settlement is approved, Mobil will have paid about $24.7 million to the class in order to gain its release from all underpayment claims, and this overall payment appears to be comparable to the payment it would have made if it were a participant in the Global Settlement. With respect to the Second Tier Claimants, Mobil's payment will be much higher than in the Global Settlement, mainly because the *Lovelace* settlement did not allocate funds differently between First Tier Royalties and Second Tier Claimants. Mobil will pay about

13.8 and 8.9 cents per barrel to early and late barrels respectively, while the Global Defendants pay about 0.9 and 6.4 cents, respectively. Meanwhile, the payment to First Tier Royalties will be somewhat lower than in the Global—about 32% of estimated damages rather than 53% (after the limitations period discount.)

It is understandable that the allocation to Mobil payees is not in congruence with the allocation under the Global Settlement since that allocation is the result of piecemeal settlements, approved by different courts at different stages in the posted price litigation. Therefore, the Court will consider primarily the overall consideration paid by Mobil to the class. As mentioned, the sum of $24.7 million appears to be comparable to the sums paid by other Defendants to settle the same claims. Further, Mobil was the first defendant to settle, and, at that time, it turned over discovery materials to *Lovelace* class counsel which were most likely useful in bringing the other Defendants to settlement. Under the *Lovelace* settlement, Mobil also agreed to adopt a trading center method for calculating payments for lease oil in the future, a concession which experts estimated was worth more to the class than the $15 million cash payment. Finally, the Court must acknowledge that Mobil's full faith and credit defense to posted price litigation remains pending on appeal, and that Mobil's possibility of prevailing on the issue requires that a discount factor be applied to the class' present claims against Mobil. In light of these considerations, the Court FINDS that the Mobil settlement is fair, adequate, and reasonable, and this Court will approve it once the New Mexico settlement has been approved by the New Mexico state court.

## G. Miscellaneous Issues Relating to Exclusion Requests

### 1. Attempts of State Court Class Representatives to Opt–Out for their Entire Class

During the opt-out period, class representatives or their counsel for two different classes certified for litigation in state courts filed requests to exclude their entire state court classes from the MDL–1206 settle-

ments. The Court must determine the effect of those attempts to opt out from the settlements.

In 1997, M.B. Rudman, on behalf of a putative class of approximately 800 owners of interests in two oil producing units (the Velma Sims Sand Unit and the Velma Tussy Unit), filed a class action suit against Texaco in Oklahoma state court, alleging that Texaco had underpaid royalties on oil production from those units. *Rudman v. Texaco, Inc. et al.*, No. CJ–97–1E (Stephens County, Oklahoma) ("*Rudman*"). Similarly, in June 1997, Judge John M. Duhe of the Fifth Circuit and other named plaintiffs filed a putative class action suit against Texaco in Louisiana state court on behalf of Texaco's Louisiana royalty owners, alleging the underpayment of royalties. *Duhe v. Texaco Inc. et al.*, Docket No. 86,848, in the 16th Judicial District Court, Parish of Iberia, State of Louisiana ("*Duhe*").

In September 1998, the Oklahoma court certified the Rudman class. In October 1998, this Court granted preliminary approval to the class in the Global Settlement.[51] In November 1998, prior to the sending of any notice to potential class members, the Oklahoma Supreme Court stayed *Rudman* pending Texaco's appeal of the Oklahoma trial court's class certification. In December 1998, the proponents of the Global Settlement sent this Court's notice to all class members, which included the *Rudman* class since the *Rudman* class is a subset of the MDL–1206 class (and also a subset of the *Kershaw* case, which sought certification of a statewide class of Oklahoma royalty owners). At the end of the opt-out period, the *Rudman* class representatives filed papers which purported to opt *Rudman* class members' "claims in the Velma Sims Sand Unit and Velma Tussy Unit" out of the Global Settlement.

A similar series of events unfolded in *Duhe*, except that the MDL–1206 class was

granted preliminary certification for settlement purposes prior to the certification of the *Duhe* class. In November 1998, Andre Toce, plaintiffs' counsel in *Duhe*, presented his case on class certification to the Louisiana state court with respect to oil. The *Duhe* plaintiffs seek both damages and lease cancellation, and they allege royalty underpayments for both natural gas and crude oil. Texaco urged that a class action seeking lease cancellation (such as *Duhe*) could not be certified unless and until plaintiffs joined as defendants all other entities owning working or overriding royalty interests in the affected leases; so in February 1999, the Louisiana court bifurcated the issue of lease cancellation from the liability issues. Just before the March 5 opt-out deadline under the Global Settlement, the Louisiana court signed "Reasons for Judgment," stating that it intended to certify the oil claims of Texaco's Louisiana crude oil royalty owners. On March 5, Toce filed papers referencing the Reasons for Judgment and purporting to opt out all *Duhe* class members (over 11,000 Texaco Louisiana oil royalty owners) "only to the extent necessary."

The Second and Ninth Circuit have squarely addressed this issue and have determined, based on a due process rationale, that a class representative cannot opt-out of a competing class action settlement on behalf of the entire class which he or she represents in a state court action.[52] *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1024–25 (9th Cir.1998); *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 412 (2d Cir.1975). For example, in *Hanlon*, attorneys filed suit in federal court and moved for approval of a settlement agreement. Subsequently, Kempton, an attorney with a competing class action, gained in a Georgia state court the certification of a class of Georgia plaintiffs for substantially the same claims (except that no federal claim was brought in the Georgia court). At the federal court's fairness hearing on the settle-

---

51. Texaco participates as a Settling Defendant in the Global Settlement. Although the *Rudman* plaintiffs were aware of the Global Settlement proceedings in this Court and *Rudman* plaintiffs' counsel attended the preliminary fairness hearing, neither Texaco nor the *Rudman* plaintiffs brought the *Rudman* state-court certification order to this Court's attention.

52. Notably, in neither *Hanlon* nor *Berry* were the state court class members given notice and the opportunity to opt-out of the state court class prior to the deadline for filing an opt-out of the federal court class. The same is true in both the *Rudman* and *Duhe* cases.

ment agreement, Kempton tried to opt out the entire class which he represented in Georgia state court. The district court found that Kempton had successfully opted-out of the settlement individually, but that his opt-out had no effect on other Georgia class members. The Ninth Circuit affirmed the district court, explaining that

> All class members in a Rule 23(b)(3) action are entitled to due process, including notice. *Phillips Petroleum v. Shutts*, 472 U.S. 797, 810–813, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The procedural due process rights of these members include an opportunity to be excluded from the action. The right to participate, or to opt-out, is an individual one and should not be made by the class representative or the class counsel. . . . There is no class action rule, statute, or case that allows a putative class plaintiff or counsel to exercise class rights en masse, either by making a class-wide objection or by attempting to effect a group-wide exclusion from an existing class. Indeed, to do so would infringe on the due process rights of the individual class members, who have the right to intelligently and individually choose whether to continue in a suit as class members. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–77, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

*Hanlon*, 150 F.3d at 1024–25. Finally, the *Hanlon* court held: "Because a class representative in a state class action, acting at the same time as a federal class action, lacks the power to opt-out an entire class without the permission of individual class members, the district court properly ruled that Kempton's actions served as an individual opt-out for

Kempton alone." *Id.* at 1025. Moreover, as the *Berry* court observed, to allow representatives in variously asserted class actions to opt a class out without the permission of individual class members "would lead to chaos in the management of class actions." *Berry*, 518 F.2d at 412.

Here, as in *Hanlon*, there is no evidence that the members of the *Rudman* and *Duhe* classes were notified of those state court classes and chose to participate in those cases. Since this Court subscribes to the due process rationale of the *Hanlon* court, the Court FINDS that the effect of the *Rudman* named plaintiffs' exclusion request and Andre Toce's exclusion request in *Duhe* was simply to opt out the named plaintiffs in those cases—not all of their respective class members.

### 2. The "Toce Letter"

■ One other miscellaneous matter remains for the Court to resolve. At the October 1998 preliminary fairness hearing, Toce appeared to object purportedly on behalf of the *Duhe* class, a then-uncertified class of Texaco's Louisiana royalty owners. He argued primarily that the *Duhe* class was inadequately compensated under the Global Settlement because that settlement did not attribute special value to the *Duhe* class' request for lease cancellation. Lease cancellation is a remedy under Louisiana law whereby a royalty owner can sometimes reacquire 100% of the mineral rights when defrauded by the lease operator. Over Toce's objection, this Court granted preliminary approval of the Global Settlement and authorized class counsel to send this Court's notice to the class.[53] Notice was sent in

---

53. There were several reasons to grant preliminary approval over Toce's objections. First, the same structural assurances that guaranteed the representation of the rights of respective subgroups likewise acted to ensure the representation of any special rights inuring to Louisiana royalty payees. Second, and more importantly, the remedy of lease cancellation appears to be worthless in the posted price litigation. It is unlikely that a significant percentage of a class of passive royalty owners would even desire to cancel their leases and renegotiate them, or that they would desire to authorize Toce or others to do so for them. Thus, the remedy in itself is not particularly valuable, except perhaps on a case-by-case basis. Even the cancellation remedy's value as a special negotiating tool (i.e., "a big stick

against large oil companies" (Toce October Brief at 5)) is not especially great in the class action context since its invocation by a putative class representative would inevitably make class action litigation unmanageable: if the entire Louisiana class were to have all their leases canceled, the working interests invested in those thousands of leases would be severely prejudiced and, as shown by the example of the Toce Suit itself, those working interests would have to be joined. The difficult task of properly aligning the interests in such circumstances would most likely decrease, rather than increase, the settlement value of such a class action suit. In short, for a class representative, it appears that the lease cancellation remedy is more of a handicap than a "big stick." It is probably for this reason that

January 1999, with an opt-out deadline of March 5, 1999.

On February 17, 1999, Toce unilaterally mailed a "Notice and Solicitation" to Texaco's Louisiana royalty owners.[54] This mailing solicited recipients to execute an enclosed contingency fee "Contract of Representation," hiring Toce as their attorney in litigation against Texaco. It also urged recipients to opt out of "the MDL Settlement"—including not only the Global Settlement (where Texaco is a Settling Defendant) but also the Stand Alone Settlements—by signing an enclosed "Exclusion Request" form. About 785 class members signed and submitted the Toce opt-out form. Also, according to Toce, about 1,000 class members executed the contingency fee contract and returned it to him. As of the final fairness hearing, there was not an accurate estimate of how many of the Texaco–Louisiana payees who opted out had done so—on the Toce form or otherwise—after February 17, 1999.

The first question for this Court is whether it is proper to give effect to: (1) exclusion requests which individual *Duhe* class members filed using the Toce opt-out form, and/or (2) other exclusion requests which individual *Duhe* class members filed after February 17 (the date of Toce's mailing). Texaco contends that the Court should not recognize any of those opt-outs since they may have been misled by the Toce letter, and that the Court should send a supplemental notice purging the taint of the Toce letter. Toce argues that his letter was a service to *Duhe* class members because it elucidated their legal alternatives. The second question for the Court is, if the Toce letter did in fact taint some or all post-February 17 opt-outs filed by *Duhe* class members, how should the situation be remedied.

 The notice disseminated to class members is crucial to the entire scheme of Rule 23. *See Kleiner v. First National Bank of Atlanta,* 751 F.2d 1193, 1202 (11th Cir. 1985) ("In view of the tension between the preference for class adjudication and the in-

dividual autonomy afforded by exclusion, it is critical that the class receive accurate and impartial information regarding the status, purposes and effects of the class action."). Notice "sets forth an impartial recital of the subject matter of the suit, informs members that their rights are in litigation, and alerts them to take appropriate steps to make certain their individual interests are protected." *Erhardt v. Prudential Group, Inc.,* 629 F.2d 843, 846 (2d Cir.1980); *Impervious Paint Ind.,* 508 F.Supp. at 723. "It is the responsibility of the court to direct the 'best notice practicable' to class members ... and to safeguard them from unauthorized, misleading communications from the parties or their counsel." *Erhardt,* 629 F.2d at 846 (quoting Fed.R.Civ.P. 23(c)(2)).

Misleading communications to class members concerning litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally. *In re School Asbestos Litigation,* 842 F.2d at 680. "Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." *Kleiner,* 751 F.2d at 1203.

 District courts have both the duty and broad authority to exercise control over the class action and to enter appropriate orders governing the conduct of counsel and parties. *Gulf Oil Co. v. Bernard* 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981). For example, in *Georgine v. Amchem Products, Inc.,* 160 F.R.D. 478 (E.D.Pa. 1995), a district court was asked to exercise this authority by nullifying the effect of opt-outs from a settlement class where their decisions to opt-out were allegedly tainted by a letter mailed to the class by counsel opposing the settlement. In that case, opposing counsel sent a notice that went to class members either in lieu of or in addition to the

---

class counsel in *Cameron Parish* (who are experienced class action litigators) did not plead the remedy of lease cancellation when raising claims under the Louisiana Mineral Code (see Consolidated Compl. at 67.) The Louisiana state court judge bifurcated the lease cancellation issue

when certifying Toce's class for litigation of the liability issue.

54. Again, these class members have not yet received notice and the opportunity to opt out in *Duhe.*

court-authorized notice. The opposing counsel's notice did not explain the benefits of the settlement, did not explain that the settlement would not be implemented if the court did not find it fair, did not explain the various legal options to the client, did not disclose that the author of the notice had a strong pecuniary interest in obtaining additional opt-outs, did not mention that the author represented objecting class members, included misleading descriptions of the settlement, included lies such as "You will get no money if you stay in the class," was sent only to subgroups of the class, and was mailed at a crucial period of the opt-out period. The *Georgine* court found that the opposing counsel's notice was so misleading that it was necessary to void the opt-outs and to renotice those opt-outs at the expense of opposing counsel, advising them that the court had since given final approval to the settlement. *Id.* at 509.

■■■ Toce sent his letter to absent class members about two weeks prior to the opt-out deadline. The Toce Letter was misleading in several of the same respects as the *Georgine* letter: e.g., it misstated the benefits of the Global Settlement, it misstated the legal options available to the recipients, and it omitted important facts about the Global Settlement and about Toce's pecuniary interests. Although it was not as deceptive as the *Georgine* notice, the Toce Letter was mailed at a critical stage in the opt-out schedule and did give the recipients an inaccurate picture of the MDL–1206 settlements. The Toce Letter did not inform recipients that, if they chose to opt out of the Global Settlement (to which Texaco is party), they also had the choice not to opt of the Stand Alone Settlements—a fact of potential significance to, for example, a member of the *Duhe* class who would be entitled to a distribution under the Exxon Settlement.[55] For these reasons, the Court FINDS that it is necessary to void the effect of all exclusion requests filed by Texaco's Louisiana royalty owners after February 17, 1999 (using Toce's opt out form or otherwise).

### 3. Re-noticing and Severing the *Rudman* Class

On March 4, plaintiffs in *Rudman* attempted to opt *Rudman* class members' *Rudman* claims out of the Global Settlement. There is no indication that this last-minute filing did or could have misled *Rudman* class members into believing that they did not need to file individual exclusion requests in order to be excluded from the Global Settlement. However, the Court does not know whether additional *Rudman* class members would have opted out of the Global Settlement if they had known about the *Rudman* class certification order.[56]

The Court ORDERS the following actions be taken:

(1) as already explained, the en masse exclusion request filed by the *Rudman* class representative on behalf of the absent *Rudman* class members is void (except as to the *Rudman* class representatives themselves);;

(2) supplemental notice shall be sent to *Rudman* class members (except for M.B. Rudman, the Rudman Partnership, and other individual members of the *Rudman* class who submitted valid exclusion requests), notifying them that they presently remain in the Global Settlement, that this Court has approved the Global Settlement, and that they have until 20 days after the supplemental notice is mailed in which to file an exclusion request and so to opt out of the Global Settlement;

(3) all exclusion requests filed by the re-noticed *Rudman* class members must be signed individually, rather than by an attorney;

(4) in anticipation of a potential appeal of this Court's refusal to permit the *Rudman* representatives to opt out all *Rudman* class members' First Tier Royalty claims against

---

55. Toce's mailing tells recipients that they must opt out of all eight settlements in order to preserve the right to join him in suing Texaco in *Duhe*. At the final fairness hearing, Toce acknowledged this error, and stated that his own goal had been simply to get recipients to file whatever was necessary to preserve the claim against Texaco.

56. A draft of the notice was available to *Rudman* plaintiffs' counsel as an attachment to the Global Settlement agreement. As stated above, however, the *Rudman* plaintiffs did not bring the *Rudman* certification order to this Court's attention before this Court's notice was distributed.

Texaco for production from the Velma Sims Sand Unit and the Velma Tussy Unit, those claims (and the funds to be distributed under the Global Settlement on account of those claims) shall be severed from the Global Settlement; and,

(5) these severed *Rudman* funds shall be burdened with the costs of re-noticing the *Rudman* class, and they shall not be distributed until the Court's order denying the attempted class-wide *Rudman* exclusion request becomes final.

#### 4. Re-noticing and Severing the *Duhe* Class

In addition to soliciting individual opt-outs, plaintiffs' counsel in *Duhe* attempted to opt out the entire *Duhe* class "only to the extent necessary." The purported class-wide opt-out was not filed until the end of the opt-out period, and there has been no suggestion that it was distributed to individual *Duhe* class members. Thus, there is no indication that it did or could have misled *Duhe* class members into believing that they did not need to file individual exclusion requests to be excluded from the Global Settlement. However, the Court does not know whether additional *Duhe* class members would have opted out of the Global Settlement if, in addition to receiving Toce's mailing, they had known about the *Duhe* class certification order that was signed on March 30 and amended on April 1.

Moreover, the Toce Letter may have improperly induced members of the *Duhe* class to file individual opt-outs. In order to remedy these interruptions in this Court's notice and opt-out procedure, the Court ORDERS the following actions be taken:

(1) as already explained, the en masse exclusion request filed by the *Duhe* class counsel on behalf of absent *Duhe* class members of the *Duhe* class is void (except as to the *Duhe* class representatives themselves);

(2) as already explained, individual exclusion requests filed by *Duhe* class members after February 17, 1999—using the Toce opt-out form or otherwise—are void (except as to the *Duhe* class representatives);

(3) supplemental notice shall be sent to the *Duhe* class (except for John M. Duhe, Gladys Duhe Deutschle, Joseph Preston Duhe, Elias "Bo" Ackal, Edna Ackal Brower, Betty Chauvin Roden, Pierre Broussard, Leta LeBlanc Broussard, Mary Grace Broussard Bringol, Paul G. Moresi, Mary Lynn Moresi, and except for individual members of the *Duhe* class who filed individual exclusion requests prior to February 17, 1999), notifying them that they presently remain in the MDL–1206 settlement class as participants in all eight settlements, that the Court has approved the eight settlements, and that they have until 20 days after the supplemental notice is mailed in which to file an exclusion request and so to opt out of any or all of the eight settlements;

(4) the supplemental notice shall indicate that individual opt-outs filed by *Duhe* class members after February 17, 1999, are void, and that they must submit another exclusion request in order to successfully opt out of any or all of the eight settlements;

(5) all exclusion requests filed by the re-noticed *Duhe* class must be signed individually, rather than by an attorney;

(6) in anticipation of a potential appeal of this Court's refusal to permit the *Duhe* class counsel to opt out all *Duhe* class members' First Tier Royalty claims against Texaco for production in Louisiana, those claims (and funds to be distributed under the Global Settlement on account of those barrels) shall be severed from the Global Settlement; and,

(7) these *Duhe* severed funds shall be burdened with the costs of re-noticing the *Duhe* class, and they shall not be distributed until the Court's order denying the attempted class-wide *Duhe* exclusion request becomes final.

### H. Attorneys' Fees

The Supreme Court has consistently recognized that "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). Each of the eight MDL–1206 settlements has established a common fund for the benefit of the class, and these funds total over $190 million. Each settlement provides that attorneys' fees will not exceed 25% of the Settlement Amount. Class counsel have agreed amongst themselves as to how the

aggregate attorneys' fees are to be allocated, *see Longden v. Sunderman,* 979 F.2d 1095, 1101 (5th Cir.1992)(approving private fee sharing agreements among class counsel); *In re Shell Oil Refinery,* 155 F.R.D. 552, 568 (E.D.La.1993), and they collectively seek a 25% fee from each settlement.

There are two possible methods for calculating the appropriate aggregate award for attorneys' fees: the percentage-of-common-fund approach and the "lodestar" approach. The Fifth Circuit's most recent statement on the issue is somewhat equivocal. On one hand, it states that it "utilizes the 'lodestar method' to calculate attorneys' fee" in common fund cases. *Longden,* 979 F.2d 1095, 1099 and n. 9 (5th Cir.1992). On the other hand, the *Longden* court notes that the prevailing trend is towards the percentage approach, and it affirms the award of the district judge who—recognizing the confusion about which method is proper—decided to "address it both ways." *Id.* at 1099 n. 9 and 1100 n. 11.

In a recent opinion, Judge Haik of the Western District of Louisiana stated that the law of the Fifth Circuit as to which of the two methods should be employed in common fund cases is "at best unclear." *Combustion,* 968 F.Supp. at 1134; (*citing* 3 Newberg App. 14–1 (1992)). However, Judge Haik reasoned that, in fact, the most important element of a proper methodology is that the district court apply the relevant factors in *Johnson v. Georgia Highway Express,* 488 F.2d 714, 717–19 (5th Cir.1974). *Id.* at 1134–35. Judge Haik then took a blended approach—first figuring the appropriate percentage in light of the *Johnson* factors and second cross-checking that result with the lodestar. Considering the strong trend toward the use of the percentage method (even in district courts within the Fifth Circuit), *see In re Catfish,* 939 F.Supp. at 500 (citing several cases), the Court will first figure fees as a percentage of the common fund in light of the *Johnson* factors and will second cross-check the fee award by the attorneys' lodestar.

In defining what is an appropriate rate of recovery for attorneys from a common fund, courts and commentators have offered various benchmark percentages. One recent survey of district courts in the Fifth Circuit found them awarding "percentages of approximately one-third contingency fee." *Combustion,* 968 F.Supp. at 1133 (citing cases); *see also In re Catfish,* 939 F.Supp. at 500. According to the Manual for Complex Litigation, "[c]ourts applying the percentage method have generally awarded attorneys' fees in a range from 25% to 30% of the fund. Several courts have concluded that 25% should be a 'benchmark' for such awards, subject to upward or downward adjustments depending on the circumstances of the case." *Id.* at § 24.121. Professor Newberg states that, for antitrust suits, the ordinary percentage is 20 to 30%. 3 Newberg § 14.03 at 14–14.

██ Due to the size of the recovery in MDL–1206, the Court should also consider the fact that percentage fee awards generally decrease as the amount of the recovery increases. *In re Prudential,* 148 F.3d at 339; *In re Shell Oil Refinery,* 155 F.R.D. at 573; Newberg § 14.03 at 14–14. This holds true because of "the belief that in many instances the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.* For example, in *In re Prudential,* the Third Circuit remanded an award of 6.7% of the $1.352 billion settlement for an adequate justification. *Id.* Of course, that case was more than six times the magnitude of the aggregate settlements in MDL–1206. More comparable cases are *In re Shell Oil Refinery,* 155 F.R.D. 552, where the Eastern District of Louisiana awarded about 18% of a $170 million settlement fund, and *In re Combustion,* 968 F.Supp. 1116, where the Western District of Louisiana awarded 36% of a $127 million settlement.

██ With these benchmarks in mind, the Court turns to the *Johnson* factors [57] to de-

---

57. In *Johnson v. Georgia Highway Express,* 488 F.2d 714, 717–19 (5th Cir.1974). The Fifth Circuit recommended twelve factors for the district court to use as it reconsidered the award: 1) the time and labor required; 2) the novelty and difficulty of the questions involved; 3) the skill required to perform the legal service properly; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent;

termine whether class counsel has earned a fee recovery above or below the norm.

### 1. The time and labor required

Posted price litigation has gone on for almost four years, and the class counsel participating in these settlements have expended over 132,000 unreimbursed [58] hours. As mentioned above, class counsel have discovered several million pages in documents, performed over one hundred depositions, responded to multiple motions to dismiss, conducted a week-long certification hearing in state court, conducted a four-day preliminary certification hearing in this Court, and also (in addition to the sum of hours reported) conducted a week-long final fairness hearing. Probably due to the fact that the issues were novel, this litigation has been labor-intensive. *Compare In re Combustion,* 968 F.Supp. at 1136 (attorneys worked just 51,000 hours in recovering $127 million).

### 2. The novelty and difficulty of the questions

"Cases of first impression generally require more time and effort on the attorney's part." *Johnson,* 488 F.2d at 718. The cases comprising MDL–1206 are all cases of first impression. The factual basis of the claim did not even develop until the mid–1980's when it became possible to apply a NYMEX trading center method to calculate the market value of oil at the lease. Godfrey and others had to create their own databases, compiling posted prices, NYMEX prices, transportation costs, grade and weight differentials and so forth simply to determine whether or not a cause of action might exist. And, in order to first articulate their claims, class counsel had to hire experts to research their allegation that the NYMEX trading center method is a reasonable way of determining market price at the lease. Moreover, counsel had to litigate for the first time, on a class-wide basis, various issues of whether the Defendants' alleged failure to pay the price calculated under a trading center meth-od constituted some breach of a legal duty or of federal and state statutes. This involved testing the laws of several states, as well as federal antitrust law. It also involved facing difficult questions of certifying statewide or nationwide classes of royalty and working interest owners. This factor suggests that class counsel receive an above-average recovery.

### 3. The skill requisite to perform the services

As well as being novel, this litigation was highly complex and thus required a great deal of lawyering skill. As just explained, the task of simply compiling the evidence was an unusually difficult task, requiring the assistance of experts and the investment of many hours. Also, being novel, the legal issues raised in the litigation required skilled attorneys to handle them. Indeed, class counsel included some of the most skilled firms and attorneys available, and it is doubtful that a less experienced group could have managed this litigation against the major participants in the oil industry.

### 4. The preclusion of other employment due to acceptance of the case

There is no question that these highly-successful firms had to pass up other cases due to their occupation with the posted price litigation.

### 5. The customary fee

"The customary fee for similar work in the community should be considered." *Id.* at 718. Class counsel and experts both reported to the Court that it is customary in large, complex commercial litigation for contingency fees to be set at 33 to 40%.

### 6. Whether the fee is fixed or contingent

There were no fixed fees in this litigation; rather, class counsel undertook these cases intending to seek a portion of the common

---

7) time limitation imposed by the client or the circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation and ability of the attorneys involved; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases.

**58.** Some attorneys have received fee awards through settlements in related cases; these already-compensated hours are not included in this sum.

fund recovered. There was a great deal of risk involved in this arrangement, given the novelty of the legal and factual issues and also given the threat of interjurisdictional competition (which did in fact prove to be fierce).

In the settlements themselves the class counsel agreed to seek no more than 25% in fees.

### 7. Time limitations imposed by the client or circumstances

This factor is irrelevant to the instant litigation.

### 8. The amount involved and the results obtained

The Tenth Circuit, which applies the Fifth Circuit's *Johnson* factors in common fund cases, has stated that this eighth *Johnson* factor is "decisive" when determining the appropriate percentage of recovery. *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir.1988). Considering the nature of the settlement negotiations, it is reasonable to analyze the "results obtained" factor separately with respect to First Tier Royalties and Second Tier Claimants in the various settlements.

First Tier Royalties recover a relatively high percentage of their damages in all of the settlements. In the Global Settlement, this subgroup recovers 32% of their total estimated damages. When that percentage is adjusted by taking into account the strength of the limitations defense (i.e., by discounting early barrel damages by 90%), this subgroup recovers 53% of their damages. Compared to other settlements in commercial litigation, this is a high figure, whether one considers the recovery to be 32% or 53%. *See In re*

*Domestic Air Transportation Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D.Ga.1993)(about 14% recovery); *In re Catfish Antitrust Litig.*, 939 F.Supp. 493, 498 (N.D.Miss. 1996)($27 million settlement for "damage calculations in the range of several hundreds of millions of dollars"); *In re Anthracite Coal Antitrust Litig.*, 79 F.R.D. 707, 714 (M.D.Pa. 1978) ("approximately 28% of the maximum possible recovery"); Janet C. Alexander, *Do Merits Matter?: A Study of Settlements in Securities Class actions*, 43 Stan. L.Rev. 497 (1991)(discussing settlements of eight securities class actions involving initial public offerings of computer-related companies; average recovery was 21.7% of the damages alleged). Moreover, in the Stand Alone Settlements, the First Tier Royalties recovered at the same rate or even higher than in the Global Settlement, as, for example, in the case of the $10 million Exxon Settlement where this subgroup will receive 76% of their estimated damages (after the limitations discount).[59] These high recoveries are especially remarkable considering that the cause of action was novel and the Defendants formidable.

The Second Tier Claimants did not gain such a high percentage of their estimated damages,[60] but this result is inevitable since their Antitrust Claims appear to be much weaker than the Lease Claims of the First Tier Royalties. Above, the Court has already discussed the weaknesses of the Antitrust Claims raised in this litigation: the economic indicators that Defendants did not agree to fix posted prices, the unlikelihood of such a broad and enduring conspiracy, and the sheer difficulty of proving such collusion even if it existed. For all these reasons, it appears that it would have been difficult for the Antitrust Claims to even survive summary judgment,[61] much less win a jury ver-

---

59. All percentages include interest on the damages.

60. As stated in more detail above, under the Global Settlement, the Second Tier Claimants will receive 13% of the estimated damages for late barrels and about 3% for early barrels. Under the Stand Alone Settlements, Second Tier Claimants are compensated at an equal or better rate in all settlements except for two: (1) under the Koch Settlement, the recovery for early barrels is less, but the overall recovery is higher; and (2) under the Phibro/Basis Settlement, the recovery is about 33% less, but that recovery is

still adequate given the fact that Basis has dissolved (and, as explained below, the attorneys' fee award under the Phibro/Basis Settlement will be significantly less than the award under other settlements).

61. Following *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "the percentage of antitrust cases resolved by summary judgment ... increased dramatically." Herbert Hovenkamp, *Federal Antitrust Policy: the Law of Competition & Its Practice* § 16.8b (1994).

dict and preserve it on appeal. Despite the difficulties of the Antitrust Claims, class counsel managed to collect over $60 million in cash [62] from the defendant oil companies to release those claims, and, significantly, they were able to nearly double the Second Tier Claimants' recovery in the Global Settlement after the Court had already granted that settlement preliminary approval. It appears that class counsel extracted the most value possible from the claims belonging to Second Tier Claimants.

Finally, it is significant that this posted price litigation may have altered the manner in which, in the future, the price of oil is calculated at the lease. Indeed, Dr. Leitzinger testified that lease prices for oil have already risen, bringing the wholesale differential closer to the mere value of transportation. Further, facilitating future litigation on posted prices, class counsel has created an expansive document depository which it has agreed to maintain for the next five years at its own expense. Of course, class counsel seeks the 25% attorney fee solely from the cash recovery to the class; thus, this future benefit of this litigation and these settlements goes to the class free of any charge.

### 9. The experience, reputation and ability of attorneys

The Court has already touched on this subject in discussing related factors. There is no doubt that class counsel includes some of the most talented lawyers available who uniquely have the experience in class actions, commercial litigation, and oil and gas law necessary to prevail in a suit of this size against these Defendants.

### 10. The "undesirability" of the case

In 1995, the posted pricing cases were undesirable only in the sense that they required a large expenditure of time and capital to even articulate the cause of action, as explained above. By the following year, once that hurdle was crossed by the pioneering class counsel in the initial cases, it appears that the cases were highly desirable since so many of them were filed in so many venues.

### 11. The nature and length of the professional relationship with the client

This factor is not relevant to the facts of this litigation.

### 12. Awards in similar cases

"The reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit." *Johnson*, 488 F.2d at 719. Above, the Court has already discussed at length the range of attorneys' fees where awarded as a percentage of the common fund. The requested fee of 25% represents an award less than or equal to the average percentage generally awarded in class action settlements. Specifically, in class action settlements of this magnitude within the Fifth Circuit, district courts have awarded fees ranging from 18% to 36% of the recovery. *See In re Shell Oil Refinery*, 155 F.R.D. 552 (18% of $170 million); *In re Combustion*, 968 F.Supp. 1116 (36% of $127 million).

In light of the *Johnson* factors, it is evident that class counsel has earned a fee which exceeds the usual fee in a class action settlement. Yet there is one countervailing factor that should be considered. Ordinarily, it may be appropriate to reduce the percentage where the settlement is of a great magnitude, *In re Prudential*, 148 F.3d at 339; *In re Shell Oil Refinery*, 155 F.R.D. at 573; Newberg § 14.03 at 14–14, even if such a reduction does not comport with the beliefs of experts that a declining-percentage structure would not ensure the best possible representation for large cases in a free market. However, in this suit, such a reduction is not appropriate, both because the case required such a large initial investment by the attorneys and because it was made more difficult due to the sheer number and variety of members in the class. That is, the attorneys have had to work harder to represent this class due to its size and diversity; they have not simply benefitted from the fact that, for example, a single tortious act harmed millions of people rather than thousands. In sum,

---

62. Notably, the consideration did not take the form of coupons or credits, as is frequently the

case in class action settlements.

since the attorneys have done extraordinary work, have tackled novel issues, and have gained a relatively high recovery and substantial benefit for the class, and since the size of the settlement does not warrant a drastic reduction in the percentage of the fee in these circumstances, an attorneys' fee award of 25% is generally reasonable.

If the Court were to award attorneys' fees of 25% in each of the eight settlements, the awards would total about $46,747,000.[63] This sum appears to be reasonable when cross-checked using the lodestar method. Class counsel expended over 132,000 hours (as yet unreimbursed) in posted price litigation contributing to these settlements. This sum does not include most of the hours spent by class counsel in both preparing for and conducting the final fairness hearing, nor does it include post-approval hearing hours spent on the disbursement or appellate issues. Based on these 132,000 hours, class counsel reports a lodestar of $34,633,182. Class counsel has submitted their time reports, and the Court believes that the hourly rates reported by the attorneys are reasonable. The rates ranged from $100/hour to $544/hour,[64] for an average of about $260/hour. This is a reasonable aggregate rate, given the fact that this was a class action suit involving novel issues in a complex commercial setting and given the experience of the attorneys working on the case. *Compare In re Combustion*, 968 F.Supp. at 1141 (using a reasonable hourly rate of $300/hour). Thus, if the total fee award were $46,747,000, the multiplier on the lodestar would be 1.35, which is certainly on the low end of the range of multipliers usually used. *In re Combustion*, 968 F.Supp. at 1133 ("Multipliers ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied")(citing cases).[65] The cross-check with the lodestar reveals that, given a fee of 25%, class counsel would barely be compensated at their hourly rate for work which involved a great deal of risk.

Thus, the Court FINDS that a 25% fee award is reasonable in the Global Settlement, the Exxon Settlement, the Fina Settlement, the Apache Settlement and the Koch Settlement. The Court FINDS that a 15% fee award is reasonable in the Atlantic Richfield Settlement (since litigation against this Defendant was not so arduous) and in the Phibro/Basis Settlement (since the recovery was less successful than others.)[66] These awards cover fees through distribution of the funds and through appeal.

## I. Costs

Class counsel reports $7,972,676 in unreimbursed costs in posted price litigation contributing to the eight settlements, or about 4.2% of the aggregate settlement fund. These costs do not include those incurred in connection with the week-long final fairness hearing, which were undoubtedly substantial given the amount of expert testimony involved, and class counsel does not seek reimbursement of those expenses. Nor do they include the costs incurred in noticing the class and processing claim forms which will be taken from the settlement fund and which may total about $14.5 million, or 7.6% of the fund.[67]

---

63. Some adjustments to the settlement fund will be made for final calculations of the First Tier Opt–Out Adjustment and for interest accruing after February 1, 1999.

64. Only one attorney, Godfrey, billed at $544/hour. Most lead counsel billed at rates of $275 to $350/hour.

65. Class counsel have reported their historic fee rates and have not accounted for interest. Counsel has been litigating for almost five years and has not received payment. In most cases, a multiplier is required to compensate for delay alone. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir.1976) (en banc); *Environmental Defense Fund v. Environmental Protection Agency*, 672 F.2d 42, 60 (D.C.Cir.1982).

66. In entering the Mobil Settlement, class counsel agreed not to seek any attorneys' fees from the Mobil Settlement funds.

67. The Garden City Group handled the notice procedure and also handled inquiries into the terms of the settlement and barrel information. Their costs may reach $13 million. The Mann Frankfort firm handled the claim form procedure, and its costs could reach $1.5 million. The Court will allocate 50% of the already-incurred Garden City costs to the First Tier Royalties' recovery and will allocate 50% of the already-incurred Garden City costs to the Second Tier Claimants. Future Garden City costs will be borne by the subgroup (i.e., First Tier Royalties or Second Tier Claimants) whom the expense goes to benefit. The Second Tier Claimants will bear all the cost of the Mann Frankfort firm. The Court also allows an additional 0.5% of the

The Godfrey group of attorneys was primarily responsible for recovering approximately $111.8 million for the First Tier Royalties in the Global Settlement. The Godfrey group incurred expenses totaling about 3.3% of that recovery. These expenses represent what it was necessary to spend to bring the Defendants to settlement, and the Court therefore will generally limit costs to no more than 3.3% of the settlement funds. In particular, the Court AWARDS the following costs: 3.3% in the Global Settlement, 3.3% in the Exxon Settlement, 3% in the Atlantic Richfield Settlement, 3% in the Fina Settlement, 2.5% in the Apache Settlement, 3% in the Phibro/Basis Settlement, and 3% in the Koch Settlement.[68]

## J. Incentive Awards to Class Representatives

■■■ At the final fairness hearing, class counsel testified as to the contributions in time and effort made by the named class representatives to this litigation. Also, two class representatives testified at the hearing. Some class representatives produced their personal records, appeared for lengthy depositions, and attended several hearings. The notice of the settlements stipulated that class representatives would receive no more than $20,000 per case ($25,000 in extraordinary circumstances).

The Court FINDS that the following awards to class representatives are appropriate: $10,000 to Bruce L. James, as trustee of Gary Green Grantor's Trust,[69] named in the Texas Suit; $5,000 to the Whiteside Charitable Trust and $5,000 to the Whiteside Scholarship Trust in the Texas Suit; $5,000 to Brenda Rainosek and $3,000 to Robert Lehmann in the *State of Texas v. Union Pacific Resources Corp.*; $5,000 to Tom Poyner and

$5,000 to the McMahon Foundation in *McMahon*; $5,000 to share between Meason Operating Company, Robert Bertolet, Todd Bertolet and Yvonne Bertolet in *Bertolet*; $2,000 to share between the three class representatives in *Manning*; $3,000 to share between the six class representatives in *Williams*; $2,000 to share between E.M. Lovelace and Thomas Steely in *Lovelace I and II*; $2,000 to Stallworth Larson and $1,000 to Katherine Knodler in *Lovelace I*; $5,000 to the class representatives in *Cameron Parish*; $4,000 to the nine class representatives in *Powell*; $14,000 to share between the four family groups (Carl Engwall, S.P. Johnson, J. Penrod Toles, and Sue Saunders) named as class representatives in *Engwall*; $2,000 to the class representative in *Nicholson*; $4,000 to share between the eleven class representatives in *Burton*; $3,000 to share between the class representatives in *Stanley*; $4,000 to share between Laura Kershaw and Virginia Autry in *Kershaw*; and $750 to Randolph Energy, Inc., in *Randolph Energy*.

## K. Recommendation to the JPML to Remand Remaining Cases to Transferor Court

The eight settlements approved by the Court dispose of thirteen of the fifteen MDL–1206 cases,[70] thereby leaving two cases pending—viz., *Mobile County Board of School Commissioners v. Texaco, Inc.*, C–98–328, and *Mobile County Board of School Commissioners v. Union Oil*, C–98–436.

The Court exercises jurisdiction over the *Mobile County* cases pursuant to 28 U.S.C. § 1407. Section 1407(a) provides that each action transferred to an MDL court "shall be remanded by the panel at or before the conclusion of ... pretrial proceedings to the

---

Global Settlement to cover certain administrative costs ordered by the Court—i.e., document depository, web site, and miscellaneous distribution costs.

**68.** Again, class counsel agreed not to burden the Mobil Settlement with litigation expenses.

**69.** James helped instigate the posted price litigation by consulting an attorney associated with the Godfrey group about the adequacy of the royalty payments to his fiduciaries as early as 1993.

**70.** *Randolph Energy v. Amerada Hess et al.*, C–98–41; *McMahon Foundation v. Amerada Hess et al.*, C–98–48; *Stanley v. Gulf Oil et al.*, C–98–68; *Nicholson v. Marathon Oil*, C–98–110; *Cameron Parish v. Texaco et al.*, C–98–111, *McMahon Foundation v. Occidental Petroleum et al.*, C–98–130; *Bertolet v. Citgo*, C–98–198; *Amoco Production v. Cameron Parish School Board*, C–98–437; *Texaco v. Canik et al.*, C–98–438; *Amerada Hess v. Sturlese*, C–98–439; *Phillips v. Cameron Parish School Board*, C–98–443; *Shell Western v. Conner*, C–98–444; *Lovelace v. Amerada Hess et al.*, C–99–75; and *Brown v. Amoco et al.*, C–98–217.

district from which it was transferred unless it shall have been previously terminated." Rule of Procedure of the Judicial Panel on Multidistrict Litigation 7.6(b) states that the Panel shall consider remand of each transferred action on "suggestion from the transferee district court." Since all other MDL cases have been concluded and so only individual issues remain in the *Mobile County* cases, the Court recommends that the Panel remand the two *Mobile County* cases to the transferor court.

## L. Conclusion

After careful consideration of all the relevant factors, the Court FINDS that the eight settlement agreements between the plaintiff class and the defendants in this litigation are fair, adequate and reasonable and are given final approval. Further, after consideration of the *Johnson* factors, the Court has determined a reasonable attorneys' fee to be 25% of the Global, Exxon, Fina, Apache, and Koch Settlements and 15% of the Atlantic Richfield and Phibro/Basis Settlements. The Court caps litigation costs at 3.3% for the Global and Exxon Settlements, at 3.0% for the Atlantic Richfield, Fina, Phibro/Basis and Koch Settlements, and at 2.5% for the Apache Settlement, with the possibility of increasing the reimbursement of costs by up to 0.5% on all eight settlements upon the proper showing. The Court also has found that incentive awards totaling $89,750 are appropriate. Finally, the Court has determined that the costs of noticing the class and processing claim forms will be taken from the settlement funds, as discussed *supra*.

The Settlement Amounts in each of the eight settlement agreements shall be distributed in accordance with the findings in this Order and in accordance with the provisions of the respective settlement agreements. The Court will issue separate final judgments in accordance with these findings of fact and conclusions of law.